## BOWLES et al. v. BOURDON et al.

### No. 11999.

Court of Civil Appeals of Texas. Galveston.

July 22, 1948.

Rehearing Denied Sept. 30, 1948.

Blades, Chiles, Moore & Kennerly, W. T. Kendall, and Fred W. Moore, all of Houston, for appellants.

Andrews, Kurth, Campbell & Bradley and F. L. Andrews, all of Houston, for appellees.

CODY, Justice.

This is a malpractice suit brought against Lynn L . Bourdon, a physician of Houston, and against a Houston hospital, by Harry L. Bowles, a minor, acting by his father and next friend, and the minor's said father, as well as his mother, joined in the suit as plaintiffs in their own right. At the conclusion of plaintiffs' evidence, the court instructed a verdict for the defendants in response to the defendants' motions therefor. The plaintiffs appealed from such action of the court so far as the physician was concerned but not as against the hospital.

The allegations of the plaintiffs' petition were in substance: That the defendant negligently bound the left arm of the minor (which had been fractured immediately above the elbow) so tight as to stop the circulation and thus brought about a total paralysis of the arm known as a Volkmann's contracture. Further, that some four hours after the fracture had been reduced and the arm set, the defendant was notified of the various symptoms which indicated the inception of said contracture, but that he negligently failed to examine the arm or to give instructions to loosen the bandage. Further, that defendant negligently failed to recognize or treat the contracture between July 16, 1941 when he reduced the fracture and bound the arm and August 21, 1941, when defendant called in a specialist.

The ground for granting the directed verdict, stated by the court, was "for the reason that plaintiffs had not supported their allegations with proper or sufficient expert testimony showing negligence on the part of the defendant Bourdon, and *had failed to show that the defendant's negligence,* if any, *was the proximate cause of the plaintiff's injury and damage."* (Emphasis supplied.)

Plaintiffs predicate their appeal upon six points. The first four of which complain of the court's action in directing a verdict for the defendant physician. Points 5 and 6 complain of the court's refusal to permit two certain physicians to testify. Plaintiffs' points 1 and 2 assert that there was evidence, expert and otherwise, to go to the jury on the issues of whether the defendant was guilty of malpractice which proximately caused the damages sued for. Points 3 and 4 complaint of the directed verdict because, plaintiffs assert, that the expert testimony of the two physicians and the admission of the defendant himself made out a case to go to the jury on defendant's action of negligence proximately causing the paralysis of the minor plaintiff's arm. Plaintiffs' 5th point complained that the court erred in refusing to allow Dr. Bloom and Dr. Lerner to testify in answer to a hypothetical question of what defendant should have done upon being advised of the symptoms indicating Volkmann's contracture on the night of July 16, 1941. Plaintiffs' 6th point is to the effect that the court erred in refusing to allow Dr. Lerner, a general practitioner, to testify what was accepted as good medical practice followed in the treatment of such cases by practitioners of ordinary skill and ability in Houston and to testify to what, in Dr. Lerner's opinion, caused a contracture and paralysis of the minor plaintiff's left arm.

■ We must overrule plaintiffs' aforesaid points 1 to 4 inclusive for we have concluded that plaintiffs' evidence, if taken as true, and considered in the light most favorable to them, was insufficient to support a conclusion by a jury that the treatment by the defendant of the fractured arm was the proximate cause of paralysis of the minor plaintiff's arm. In a malpractice suit the plaintiff is met with the legal presumption that a physician has discharged his full duty " 'and to defeat this presumption the law exacts affirmative proof of breach of duty *coupled with a affirmative proof that such breath of duty resulted in injury.'* " (Emphasis supplied.) Kaster v. Woodson, Tex.Civ.App., 123 S.W.2d 981, 982, 983; Floyd v. Michie, Tex.Civ.App., 11 S.W.2d 657; Kootsey v. Lewis, Tex.Civ.App., 126 S.W.2d 512, 513.

■ A physician's legal liability is measured by the fact that he "merely engages

that he has that reasonable degree of learning and skill which is possessed by others of his profession in the same locality, or by the 'average physician under the same or similar circumstances,' and that he will exercise that skill and learning with reasonable care and diligence. In other words, exercising a high degree of care is not required of an attending physician; all that can be expected is the use of ordinary care, skill and diligence. Although required to exercise his best judgment in the circumstances, and to look for natural and probable results, if he has exercised ordinary care and diligence he is not responsible for a mistake in judgment nor for the occurence of unexpected results which reasonably could not have been anticipated." 33 Tex.Jur. 338, 339.

Such being the standard of skill and care required of a physician, it follows that jurors, in the exercise of their mere lay knowledge, cannot determine whether a physician has complied with the standard referred to. As stated in Kaster v. Woodson, supra, "The courts and juries are not supposed to be conversant with what is peculiar with the science and practice of the profession of medicine and surgery. Such has been the law in all civilized nations since in his Politics, Aristotle wrote: 'As a physician ought to be judged by the physicians, so ought man to be judged by their peers.'" In Kootsey v. Lewis, supra, at page 513 of 126 S.W.2d, it was said: "it is incumbent upon Lewis (the plaintiff in a malpractice suit) in order to recover from Dr. Kootsey in addition to showing the treatment given by Dr. Kootsey was negligence, *to show by expert evidence that such negligence was a proximate cause of his injury*—in a word, that the negligent manner of treatment caused the infection which necessitated the amputation of the hand." (Citing authorities.) (Emphasis supplied.)

Bearing the above stated rules in mind, it will be seen when we come to examine plaintiffs' evidence in this case, that the same was sufficient to have gone to the jury on the issue of whether or not the defendant was guilty of negligence but was not sufficient to go to the jury on the issue of whether said negligence was the proximate cause of the paralysis. This, because there was medical or expert testimony from which it could have been inferred by the jury that the defendant was guilty of negligence (indeed, as will hereafter be seen this could have been inferred from the defendant's own testimony) but there was no medical or expert testimony from which it could be legitimately inferred by a jury that the same was the proximate cause of the paralysis of the arm. Without such evidence the issue of proximate cause was not raised for the jury. The pertinent and controlling evidence stated most strongly in favor of plaintiffs was as follows:

On the afternoon of July 16, 1941, when Harry Bowles was four years old and while he was playing piggy-back with his sister, who was about a year older, he fell about a distance of 2 feet and fractured his left arm just above the elbow. His mother took him to the hospital where she was referred to defendant. The defendant had the arm X-rayed and had the child kept under the influence of an anesthetic for about an hour while defendant reduced the fracture and set the arm. Defendant bound the arm in a "fully flexed" position with a tight bandage, that is, the left arm was bent so that the forearm was brought as far as it could go against the upper arm and then taped into a cone-shaped position.

The boy's mother left the hospital with him about 7:30 P.M. July 16, 1941. The boy's father who had not been called from his work, got home that night about 10:15 and then he and his wife examined the child and found the child's hand was blue and ice cold. Mrs. Bowles then phoned the defendant telling him the boy's hand was awfully blue and ice cold and she asked the defendant if the bandage could not be too tight because the hand was so cold. But the defendant instructed Mrs. Bowles that the hand was alright and not to worry about it, but to bring the boy in for examination the next day.

The next day when the boy's parents took him to defendant's office, Mrs. Bowles asked the defendant about the hand being so cold and blue and defendant said he thought the bandage was too tight and "snipped it a little on both sides." Thereafter, the boy's

parents took him to see defendant every day for the first week and about twice a week thereafter until August 21, 1941. About two weeks after the arm was fractured, Mrs. Bowles asked the defendant why the boy was not able to move his fingers and why his hand looked sort of blue, but was told there was nothing wrong with the hand. But on August 21, 1941, Mrs. Bowles again called defendant's attention to the boy's fingers. The defendant then asked her if the boy hadn't been able to move his fingers and the mother told him "no," and that she thought defendant knew. The defendant then said something had gone wrong, that it looked as if there had been some sort of nerve injury and called in Dr. Bloom, a bone specialist.

The expert evidence from which the jury could have inferred negligence in treatment on the part of the defendant was developed by plaintiffs in examining the defendant whom they called to the witness stand. In order to understand the legal effect of such evidence, it is first necessary to give the evidence leading up thereto. The following questions were put by plaintiff's attorney and the answers thereto were made by defendant:

"Q. On page 610 of your text, * * * that is Key and Conwell on Fractures, Dislocations and Sprains, third edition, there appears this statement. 'In a typical case there is a history of a fracture usually at the elbow, in which has been treated by tight splints, bandages or casts and which intense pain and swelling has followed the treatment. As a rule the contracture is not noted early, but becomes evident after the dressings have been removed and continues to progress over a period of months and may reach such a degree that the strongly flexed fingers press the palm of the hand and cause pressure sores.' Do you agree with that? A. Yes, assuming that a too tight cast has been applied. * * *."

"Q. Do you agree with this statement: 'The dressing may not have been too tight when it was applied but the arm may have continued to swell and causes it to be too tight later. Consequently no physician or surgeon should apply a Bolar splint or place an elbow in acute flexion unless he can see or get a reliable report on the patient from four to twelve hours later and unless he can recognize the symptoms of Volkmann's ischemic paralysis on sight or when they are reported to him.' Do you agree with that statement? A. Yes sir."

Defendant went on then to testify that neither a Bolar splint nor a circular bandage were used. It was made clear from the evidence that a Volkmann's contracture is caused by the circulation being cut off and that "Volkmann's contracture is a condition in which certain muscles have degenerated, and these muscle fibers have been replaced with scar tissue which produces a contracture" and that it may occur in the legs or arms.

"Q. Isn't it true that paralysis often develops where a too tight bandage is applied? A. It may develop from a too tight bandage, * * *. There are many other things that can produce a Volkmann's contracture."

The defendant admitted in response to a question, that in a child of four, that a Volkmann's contracture should be particularly looked out for and guarded against. He testified that he did not discover the contracture until August 21, 1941, and testified that he had looked for it.

"Q. If Mrs. Bowles or Mr. Bowles had telephoned you shortly after 10:15 on the night that you set the arm, and reported to you that the hand was ice cold and blue, what would you have done? A. If I had understood that, I would have asked to see the child. I would either come over or had them meet me at the hospital, because there would be no excuse for not seeing a case that had an ice cold hand."

 Under the thoroughly well settled rule that where a defendant demurs to the plaintiff's evidence by moving for an instructed verdict, he must admit for purposes of his motion that the plaintiff's evidence is true. The defendant cannot be heard to urge that Mrs. Bowles did not tell him over the telephone what she said she told him over the telephone and it is perfectly obvious that what she told him was very simple and clear and easy to be understood so that for the purposes of this appeal it must be considered that the doctor

understood that the child had an ice cold hand and he did not do what he said there was no excuse for him not doing, namely, seeing the child's hand at the time he was given such information. Thus, the defendant himself furnishes the expert medical testimony from which the jury could have inferred that he was guilty of negligence. But we have not been able to find any medical or expert evidence which would have warranted a finding by the jury that any negligence on the part of the defendant was a proximate cause of the paralysis which followed the fracture. That being true and it further being true that a jury cannot, in the absence of such testimony, themselves determine proximate cause without the aid of such expert testimony, we must hold that the court correctly held that plaintiffs have failed to make out a case.

The medical evidence bearing on the point of the proximate cause of the contracture or paralysis was to this effect, that before the fracture was reduced there was no radial pulse in the boy's fractured arm, but after the fracture was reduced the pulse became palpable or noticeable. Indeed it was upon this evidence that Dr. Bloom gave as his positive opinion that the injury occurred at the time of the fracture and as a result thereof and before it was reduced because the circulation was stopped or cut off during the period that the radial pulse could not be found but after the fracture the circulation was restored.

The medical testimony disclosed that a Volkmann's contracture may be caused by traumatic arterial spasms, thrombosis, embolism, perforation or rupture of a blood vessel and that it could have resulted regardless of any treatment given and the opinion of Dr. Bloom as stated above was that it probably resulted in this instance from the original injury. There was no medical evidence that was admitted by the court either by way of opinion or by way of fact which would have supported an inference by the jury that assuming the defendant negligently permitted the arm to remain bandaged too tightly and thereby cut off the circulation that this was the probable cause of the paralysis. As pointed out above, the jury cannot draw medical conclusions in the absence of expert evidence. In other words, there was no medical expert evidence admitted in this case to the effect that under the facts the paralysis was probably caused by the bandage applied by the defendant.

■ Plaintiffs asked certain hypothetical questions of Dr. Bloom and Dr. Lerner. The court did not permit same to be answered. The plaintiffs did not show by the doctors, at the time the questions were asked, what the answers would be and the attorney did not state to the court and counsel what said answers would be, and what they would have been were shown only by ex parte affidavits of said doctors. This is shown by the courts qualifications of the bill of exceptions. The rule regulating bills of exception is Rule 372, Texas Rules of Civil Procedure. We believe that a bill of exception cannot be amplified and expanded by putting into the record after the trial has been concluded by ex parte affidavits what a witness would have testified to had he been permitted to answer the question. That is to say, unless there were circumstances present which do not appear to have been present here. Plaintiffs have not shown any authority for the practice which they have followed. Defendant has cited in support of his contention that such practice is not permissible, the holding of Guilmartin v. Padgett, Tex. Civ.App., 138 S.W. 1143, which was reversed upon another ground. For the reasons given we have concluded that we must affirm the action of the court in directing the verdict in favor of defendant at the conclusion of plaintiffs evidence.