FORT WORTH & R. G. RY. CO. v. WOODWARD. (No. 2760.)*

(Court of Civil Appeals of Texas. Texarkana. June 8, 1923. Rehearing Denied June 21, 1923.)

1. Evidence ⚖➙20(2)—Common knowledge that unsafe railroad roadway and bridges are reported to train dispatchers and order transmitters.

It is a matter of common knowledge that, when a railway's roadway and bridges are not safe, such fact is reported to employees charged with dispatching trains or transmitting orders for their guidance.

2. Evidence ⚖➙20(2)—Allegations of railroad agents' and employees' negligence in operating trains held sufficient to include dispatcher; common knowledge that dispatcher is agent of company in operating trains.

Allegations that a collision was due to the negligence of a railroad's agents and employees in operating its trains held sufficiently broad to include a train dispatcher, who as a matter of common knowledge is the agent of the company in operating trains.

3. Carriers ⚖➙300—Engineer, flagman, and dispatcher held negligent in collision as matter of law.

In an action for injuries to a passenger on a train which, while stopped on the main line because of impassable bridge, was struck in the rear by a freight train traveling downgrade on slick rails in a dense fog, the freight engineer, passenger train flagman, and train dispatcher held negligent as a matter of law.

4. Evidence ⚖➙558(11)—Cross-examination of medical experts as to familiarity with certain treatises, author's standing as authority, etc., held permissible.

Cross-examination of medical experts as to their familiarity with certain treatises, the author's standing as an authority, and whether their views corresponded with his, held permissible to test their knowledge and determine the weight of their testimony.

Appeal from District Court, Tarrant County; Bruce Young, Judge.

Action by Corrie Jean Woodward against the Fort Worth & Rio Grande Railway Company. Judgment for plaintiff, and defendant appeals. Affirmed.

⚖➙For other cases see same topic and KEY-NUMBER in all Key-Numbered Digests and Indexes

*Writ of error refused October 24, 1923.

Corrie Jean Woodward, a young woman 19 years old, brings the suit by next friend against the appellant to recover damages for personal injuries sustained by her while en route to Fort Worth from Brady, Tex., as a passenger on the appellant's regular passenger train. The passenger train was flagged and was stopped in the morning of December 20, on the main line, and a freight train following the passenger train ran into the rear end of the passenger train, telescoping the rear Pullman car up to berth No. 10, and violently shoving the entire passenger train 30 feet or more forward. The appellee was in the dressing room of the sleeper at the time, dressing to leave the train at Fort Worth, her destination, some 20 miles distant from the point of collision. She sustained serious bodily injuries as a result of the collision. The petition alleges, as pertains to negligence, as follows:

"And while she was in the dressing room of said Pullman car making her toilet, a freight train owned and operated by the defendant, through the carelessness and negligence of its agents and employees in the service of the defendant operating said trains, crashed into the rear end of the passenger train with such force and violence that the plaintiff was thrown against the lavatory or some other projection or object in the dressing room where she was then engaged in making her toilet. That this plaintiff is unable to allege the particular act or acts, omissions or commissions of the agents and employees of the defendant, or the particular agent or employee, whose acts or omissions caused the collision, but this plaintiff does allege that the collision was occasioned by the carelessness and negligence of some agent or employee of said defendant, and was not in any way contributed to by any act of this plaintiff."

The appellant answered by general denial, and specially pleaded that: (1) Appellee did not receive any injury as a proximate result of the collision, but was suffering from conditions and complaints due solely to natural causes; and (2) the conditions and sufferings alleged are due to causes and conditions for which the appellant "is in no wise responsible and of which said accident and injury are not a proximate cause," and "that such conditions have been aggravated and increased by the actions and conduct of the plaintiff since said accident and alleged injuries, and by reason of the failure of plaintiff to exercise ordinary care for her own health, treatment, and welfare."

The appellee purchased a railway and a Pullman car ticket at Brady, Tex., for Fort Worth. The passenger train left Brady at 9:20 o'clock p. m. of December 19, and after passing Brownwood the engine began to "steam," and continued "steaming badly during that entire trip." The engine had to be stopped more than once on the main line, between stations, on account of the engine's lacking steam. Reports were made by the conductor to the dispatcher's office of the delay. The passenger train finally reached Cresson, a station 24 miles south from Fort Worth, at 8:50 o'clock a. m. of December 20, three hours behind the schedule time for arrival. The agent at Cresson was a telegraph operator, and knew, as he says, that the train was running late, and that it was running late because, as the conductor informed him, "the engine was not steaming good, and it would have to stop and blow up steam." On account of this train's running late it was stopped at Cresson "a little longer than the ordinary train stop" in order to get "train orders" for further movement to Fort Worth. It is a part of the station agent's duty to receive from the dispatcher, and to deliver to conductors and engineers, train orders for the movement of trains. Train orders are orders issued by the train dispatcher through the station agent to the conductor and engineer of the train respecting the further movement of the train. After receiving the train orders to proceed to Fort Worth, the passenger train left Cresson at 9:02 a. m. When the passenger train reached a point 4 miles out of Cresson, the engineer was signalled by a flagman standing near the track to stop. The passenger train stopped where it was signaled to do so, on the main line track, there being no side track at the point, "at the foot of a depression," that is, near the approach to a stream of water. The track leading up to the point where the train stopped was, for some little distance back, downgrade. The reason for the flagging appears in the evidence of the passenger engineer as follows:

"A flagman was the cause of my train having stopped. I received a stop signal. He has a red flag, which is a flag signal. There had also been signals in the way of torpedoes. It was a bridge flagman that stopped me. The bridge men were working on the bridge and had it torn up—the bridge was ahead of me. The point where this collision occurred was right at the foot of the depression. It was a branch. As to the weather that morning, there was a dense fog."

That "the bridge men were working on the bridge and had it torn up" is all the evidence concerning the bridge. Within two or three minutes after the passenger train stopped, freight train No. 32 ran into the rear end of the passenger train, with the result before stated. It appears that freight train No. 32 started from Brownwood ahead of the passenger train, but the passenger train caught up with and passed freight train at Stephensville. The freight train again caught up with the passenger train at Cresson, and stood on the track just behind it. The freight engineer knew that the passenger train was running late, and knew that it left Cresson at 9:02 a. m. The morning was foggy. As described, "The

fog that morning was unusual in that section of the country." The station agent at Cresson and the conductors and engineers of both the freight and the passenger train knew of the heavy fog and that it had lasted during the night and all the morning. The freight engineer knew, as he says, that "the rails had been slick practically all the morning, were very slick, caused from the fog and dampness." The freight train left Cresson, following the passenger train, at 9:08 a. m., six minutes after the passenger train had left. It was shown that the usual and customary time between the departure from stations of trains going in the same direction is five minutes where a freight train follows a passenger train, and ten minutes where a passenger train follows a freight train. The freight train was running at 20 miles an hour when it reached a point "about two telegraph poles from this passenger train," and there the engineer, as he said, "first saw it" standing on the track, and he quickly applied the emergency brakes, which had the effect of reducing the speed to about "15 miles an hour," but not of averting a collision with the rear end of the passenger train. The freight train could not be stopped, at the speed it was running, within the 200 feet distance, in time to avoid the collision. According to the freight engineer's evidence, the collision occurred "at 9:15 a. m." All the testimony concerning the collision at the point of collision is undertaken to be given. The passenger conductor testified:

"At the time the passenger train stopped, I was riding in what is known as the smoking car, about two cars from the engine. The rear brakeman was in the car at the time. I heard the explosion of the torpedoes, but didn't see the signal of the flag. When the train slowed down and stopped, the flagman, or the brakeman, got out on the steps and went back towards the rear end. He got out about the time the train stopped. When he got out he turned up the track and went towards the rear end of the train, got his signals, and went on out to flag. The brakeman was running when I saw him going back. * * * I didn't see the flagman just at the time of the collision. When I first saw the freight train, it was, I guess, about two telegraph poles behind my train. * * * The rule about operating freight and passenger trains is for the flagman to go back far enough to protect the train when the passenger train stops on the main line. If they get so close together that he can't stop the train at all, that would be because the train was following the other train too close. Really, freight trains should be kept five or ten minutes apart, and not less than five minutes, and that gives the flagman ample opportunity to go back and flag if the trains are kept five minutes apart. The only way, then, for the trains to get together is for the freight train to get up too close, or for the flagman not to go back like he ought to."

The engineer of the passenger train testified:

"When I looked back (immediately on stopping), I saw the brakeman, or flagman, of the passenger train. He was at the time on the ground, going towards the rear of the train in a trot—or, as I might say, run. I would say that anywhere from a minute to a minute and a half elapsed from the time I speak of until the collision. * * * The best place for the flagman who protects the train to ride, so as to effectually protect the train, is at the rear end of the train; that is really where he should be; that is his position. In practical railroading in five minutes he should protect the train. * * * It is his business to keep them from running into each other, and that is the reason for having the space of time referred to, and likewise the reason for having the flagman on the rear end of the train."

The freight engineer testified:

"Along where the collision took place, and a little way to the south of it, the track is straight for about three-quarters of a mile. It is downgrade towards Fort Worth. Right near and ahead of the place of collision is a little bridge or trestle. The weather that morning was foggy—very foggy. It varied along the road as to how far you could see through the fog; right at this particular place you could see about two telegraph poles. I was about two telegraph poles from the passenger train when I first saw it, and I applied the brakes and emergency. At that particular time I was making approximately 20 miles an hour. I made the application of the emergency and air, and as quick as I did that I proceeded to get off. I was partly knocked off, and partly got off. I had struck the train. The rails that morning were very slick from the atmosphere—the fog and dampness. I saw the flagman of the passenger train. When I first saw him, he was a little way back of the Pullman; I could not say exactly how far, because when I saw him I knew I was too close to stop, so I was busy setting brakes and getting off. I saw the train and the flagman at the same time. At that time I made the application of brakes as quick as I could. The brakeman was going south, which would make him coming towards me, as my train was going north. The accident occurred at 9:15 o'clock a. m. I noticed my watch shortly afterwards. * * * I can't remember exactly where the fog set it, but it was practically all night or the latter part of the morning. * * * The flagman on a passenger train must ride on the rear end of the train, and in case the train stops on the main line it is his duty to go back and flag immediately, and to go back far enough to prevent the train that may be following from running into his train. The flagman was not back far enough to protect his train when I ran into him. He should have been back 400 or 500 feet. I was going approximately 15 miles an hour when I struck the train. * * * If he (the flagman) had been back far enough, of course, I would not have run into this train. If he had been farther back, I would not have hit it. If he had been far enough back to protect the train according to the rules of the railroad, I don't think I would have run into the train. I had ten cars in my train and they were all loaded. If it had not been foggy, I could have seen the passenger train up to the top of the hill, the next curve, about three-quarters of a mile

ahead. That fog that morning was unusual in that section of the country."

J. M. Hayes, a passenger in the sleeper, testified that—

When the passenger train stopped, "the engineer whistled for the flagman to come up. The flagman in a minute—a very short time—came by us, and it didn't seem to me to be two minutes from that time until we felt the crushing of the train and the shoving forward of our train. It smashed into us and crushed our car up to seat No. 10."

The court peremptorily instructed the jury to return a verdict in favor of the appellee, leaving to the decision of the jury as the only issue questions concerning the extent of injuries and amount of damages.

We conclude that the evidence establishes the facts: (1) That the appellee was a passenger on appellant's regular passenger train; (2) that the freight train forcibly ran into the passenger train while the passenger train was standing on the main line track; (3) that appellee sustained serious and permanent bodily injuries; (4) that the rear end collision resulted from the negligence of the agents and servants in the service of the appellant operating the trains: (5) and which negligence proximately caused the injuries of appellee which she sues for; and (6) that the evidence warrants the sum allowed by the jury as damages for the injuries sustained.

Goree, Odell & Allen, of Fort Worth, for appellant.

Jones, Sexton & Jones, of Marshall, and Raymond Buck, of Fort Worth, for appellee.

LEVY, J. (after stating the facts as above). It is the contention of appellant that the trial court erred in determining, and peremptorily instructing the jury, that the evidence conclusively established as a matter of law that the collision resulted wholly through negligence on the part of the agents and employees in the service of the appellant operating the trains. The appellant urges that the evidence raised the issue for the jury to decide both as to whether or not the collision was an unavoidable happening, or was due to negligence on the part of the train operatives.

Of course, if the evidence, properly construed, does not show as a matter of law that there was failure, as alleged in the petition, of the "agents and employees in the service of the defendant operating said trains" to exercise that degree of care legally owing to passengers in the operation of trains to avoid a collision between two trains out on the main line, then appellant's contention should be sustained that the court erred in not submitting the issue to the jury. As the record is presented, the evidence is undisputed that the passenger train left the station of Cresson at 9:02 o'clock a. m., and that the freight train left the same station, following the passenger train, at 9:08 a. m. The passenger train, according to the evidence, upon leaving Cresson was running at the speed of "one-third of a mile in a minute," or twenty miles an hour. It thus appears that the passenger train made the four miles out of Cresson in twelve minutes, and that it was 9:14 o'clock a. m. when it stopped at the signal of the bridge flagman. However, as the conductor and engineer of the passenger train and the passenger Hayes all placed the time of collision at "between two and three minutes" after the passenger train stopped, it might be inferred that at the time the passenger train stopped at the four-mile point it was 9:12 or 9:13 o'clock, instead of 9:14 o'clock. At 9:15 o'clock a. m., according to the testimony, the collision occurred. The freight engineer placed the exact time of the collision at "9:15 o'clock a. m.," he having looked at his watch to verify the time. Nor do the circumstances or the evidence of any witness tend to contradict the freight engineer as to the precise time that the collision occurred. Establishing, as the evidence does, that the collision occurred at 9:15 o'clock a. m., then it was in seven minutes after it left Cresson that the freight train ran into the rear end of the passenger train. If the passenger train was running, as the evidence shows, at its usual speed, and such usual rate of speed placed it at the four-mile point at 9:12 or 9:13 o'clock a. m., then it is evident from the evidence that the freight train was not being operated so as to keep five minutes at least behind the passenger train schedule running time. The freight train was running only two or three minutes at most behind the passenger at the time the passenger train stopped. Further, it is undisputed that the brakeman of the passenger train, called "the flagman," was not at his proper place on the train at the time the passenger train stopped, and by reason thereof failed to get further back than "two telegraph poles," or 200 feet, behind the sleeper before the collision occurred. The operatives of the trains testify, "the only way then," if two trains run five minutes apart, "for the trains to get together is for the freight train to get up too close, or for the flagman not to go back like he ought to."

All the evidence agrees that if the flagman "had been further back," the collision would have been averted, although the freight train was running at the time less than five minutes behind the passenger train time. The collision could not be averted, under the circumstances, it is established, by a signal given in so short a distance as 200 feet. The evidence is that the flagman should have been, in order to avert the collision under the conditions existing, "back four or five hundred feet" from the sleeper.

[1-3] All the circumstances conclusively

show that there was failure on the part of the freight engineer and the flagman of the passenger train to observe and follow the two rules prescribed as being the ordinary and practical standards of safety in the operation of trains on the main line; the one being that the freight train should run five minutes at least behind the schedule running time of the passenger train, and the other being that the passenger rear brakeman should keep stationed on the end of the rear car of the train to flag approaching trains at any time when the passenger train might stop on the main line. Hence, upon this proof of admitted failure on the part of said train operatives to observe the two ordinary and practical standards of safety prescribed for the operation of trains on the main line, negligence towards a passenger could clearly and reasonably be predicated as a matter of law. But in order to determine whether it can legally be said that there appears an uncertain inference of negligence on the part of the operatives of the train, or that the collision might as plausibly have resulted from an unavoidable happening, the further attendant circumstances are considered· in connection with the above facts. According to the evidence there was a heavy and unusual fog that morning that rendered it impossible for the freight engineer to see further than "two telegraph poles," or 200 feet, ahead of his engine. That fact was not the producing cause of the collision, and would not relieve the presumption or inference of negligence arising· from the operation of the freight train so close behind the schedule time of the passenger train as the evidence shows was done. The engineer knew, as he says, all about the density of the fog before he left Cresson and all during the time he was running the four miles. The fog did not suddenly arise. Consequently the evidence conclusively shows that even though the freight engineer knew that he was following the passenger train under conditions of "slick, very slick rails," and "very foggy weather," and on "a downgrade track" shortly out of Cresson, yet that he nevertheless so operated the freight train as to cover four miles in seven minutes and to run less than five minutes behind schedule running time of the passenger train, resulting in the collision. Assuming that but for the fog the freight engineer could have seen the passenger train in time to have stopped the freight train, yet negligence as a matter of law could be predicated on the fault of the flagman. The flagman of the passenger train also knew of the weather conditions and the track conditions and that the freight train was following; but notwithstanding all these known conditions, he was, without any effort at excuse, out of his usual and required position, proximately resulting in his failure to reach a point more than 200 feet to the rear of the sleeper before the freight train

came up. It is clear that the collision was not caused, or probably caused, by the weather conditions as an unavoidable cause not within the control of the company or the operatives of the trains. There is no suggestion of accident or unavoidable happening free from the fault of the operatives of the trains.

It is true that the passenger train did stop suddenly and after the freight train had left Cresson. The stopping, though, of the passenger train on the main line, does not appear in this record to have been through causes or circumstances which tend to or which certainly raise no presumption of negligence in the operation of either the passenger or the freight train. The passenger train was stopped because, as appears, "the bridge men were working on the bridge and had it torn up." There appears no explanation that the bridge was suddenly, through freshet or others causes, put in this impassable or insecure condition for the passenger train to· pass over. The fact that the regular bridge gang "had it torn up" in their work upon it would indicate, in the absence of evidence to the contrary, that only usual and ordinary repair work was being done on the bridge. That the bridge was undergoing repair work, not shown to be brought about suddenly by freshet or some other uncontrollable cause, and that its use was not clear for the passenger train, is a matter that the company could know and would be presumed to know. It could not be assumed that such condition of the bridge was too trivial to require previous report on. It is a matter of common knowledge that when the roadway and bridges are not safe for the trains to use, such fact is reported to the employees charged with dispatching trains or transmitting safe orders for their guidance. The information concerning the unsafe condition, through repair work being done or from other causes, of the roadway or bridges, is placed by the proper agents with the train dispatcher. The train dispatcher is charged ,with dispatching trains or transmitting telegraphic orders therefor, and the object of train dispatching is to place in the hands of conductors and engineers who run the trains proper and safe orders for their guidance. The source of such orders is the office of the train dispatcher, from which they emanate, and their destination is the hand of the conductor and the engineer of the train whose movements they are intended to direct and control. An explanation is not given nor a reason stated why the dispatcher allowed, in the facts, the passenger train or the freight train to leave Cresson until the bridge was clear for use, or especially to allow the freight train to follow the passenger train without notice that the bridge was not passable or clear for the passenger train to cross over. It was in the authority and power of the dispatcher to hold the freight train back

at Cresson, or to give train orders to stop near where the passenger train stopped. In the entire absence, as here, of any reason for the failure of the dispatcher to notify the freight engineer and conductor as to the condition of the bridge and the likelihood of the passenger train's stopping there, negligence could be predicated on such failure. The allegations of the petition are broad enough to include a dispatcher. The allegations are that the collision was due to the negligence of the "agents and employees in the service of the defendant operating said trains." A dispatcher, as a matter of common knowledge, is an "agent" of the company "operating" a train. He is as much connected with the operation of a train as any employee actually on the train. A dispatcher orders the train held, or moved forward, and he does not allow the train to use the main line track until it is clear. An engineer does as much when he actually moves the train forward or stops the train. A flagman protects by warning an approaching train, while the dispatcher does not allow the train to use the main line track until it is clear and safe. We conclude that the court did not err, and that the assignments should be overruled.

[4] Error is predicated on permitting appellee's counsel, on cross-examination of medical experts testifying for appellant, to question said doctors concerning their familiarity with the treatises of Dr. Murphy, and of his standing as an authority on surgery and certain diseases, and about how their views corresponded with that of such authority as Dr. Murphy. The evidence complained of was not elicited on direct examination of appellee's own doctors testifying in her behalf as sustaining evidence. Ry. Co. v. Robertson (Tex. Civ. App.) 200 S. W. 1120. The rule permits such evidence on cross-examination of a medical expert testifying for the opposite side "to test the knowledge of the so-called expert and to determine the weight of his testimony." Ry. Co. v. Farmer, 102 Tex. 235, 115 S. W. 260; Ry. Co. v. Dooley, 62 Tex. Civ. App. 345, 131 S. W. 831.

We have carefully considered the remaining assignments, and conclude that each of them should be overruled.

The judgment is affirmed.