# APRIL, 1949

Harry L. Bowles et al v. Lynn L. Bourdon et al.

No. A-1922. Decided March 10, 1949.
Rehearing overruled April 27, 1949.
(219 S. W., 2d, 779.)

*Blades, Moore & Kennerly, W. T. Kendall* and *Fred W. Moore,* all of Houston, for petitioners.

The Court of Civil Appeals erred in holding that there was no evidence showing that defendant Bourdon's negligence (which was found to exist by the court) was the proximate cause of the permanent paralysis of Harry Bowles' left arm. J. Weingarten, Inc., v. Brockman, 134 Texas 451, 135 S. W. (2d) 698; Wren v. Wilburn, 182 S. W. (2d) 1007, writ of error refused; Lanier v. Trammell, 207 Ark. 372, 180 S. W. (2d) 818; Reinhold v. Spencer, 53 Idaho 688, 26 Pac. (2d) 796.

*Andrews, Kurth, Campbell & Bradley* and *F. L. Andrews,* all of Houston, for respondent.

The evidence in this case was insufficient to warrant the submission to the jury of any issue as to whether respondent's negligence, if any, was the proximate cause of petitioners' damages. Barker v. Heaney, 82 S. W. (2d) 417; Edwards v. West Texas Hospital, 89 S. W. (2d) 801; Houston Clinic v. Busch, 64 S. W. (2d) 1103.

MR. JUSTICE BREWSTER delivered the opinion of the Court.

This is a suit for damages for malpractice brought by Harry L. Bowles et al, petitioners, against Dr. L. L. Bourdon, respondent. On an instructed verdict, the trial court rendered judgment for respondent, which was affirmed by the Court of Civil Appeals. 213 S. W. (2d) 713.

On July 16, 1941, Harry L. Bowles, a boy four years old, fell and fractured his left elbow just above the joint. About an hour later respondent made an X-ray plate of the elbow, administered an anaesthetic, set the injured arm, brought the lower arm up against the upper arm and bound them together by wrapping tape and bandage around them to form a cone shape. Then he took another X-ray to determine that the broken bones were properly set. Before this was done there was some hemorrhage with blueness around the elbow and some swelling of the arm and no pulse; but after it was done the pulse could be felt.

The parents of the boy and another testified that some four hours after the elbow had been set they discovered that "His hand was turning very blue and his fingernails were very purple. His fingers and hand were cold, it seemed like all of the circulation was leaving his hand and naturally it turned cold and blue." They said also that the boy was in pain.

The mother then telephoned respondent, told him that the hand was "awfully blue and was ice cold," and asked if the bandage could be too tight "because the hand was so cold." She testified that respondent stated that the hand was all right and that she should not worry about it but to bring the boy in the next day for examination. Respondent testified in his deposition that he did not remember the call clearly, but at the trial he said that since the taking of his deposition he did recall the conversation in part, but did not recall any mention of the hand being discolored and cold. He said, "I think if that had been mentioned, that was too serious for me not to remember. I think I would remember it if it had been brought home to my attention." The only part of the conversation he remembered was that the boy was suffering pain, which he said was to be expected. He further testified, "If I had understood that, I would either come over or had them meet me at the hospital, because there would be no excuse for not seeing a case that had an ice cold hand."

When the parents took the boy to respondent's office the next morning, the mother asked him about the hand, as the conditions indicating a circulation impairment continued to exist. She testified that he said he thought the bandage was too tight and "snipped it a little on both sides."

The record shows that another doctor testified that an X-ray plate taken on the 25th of July showed the angle of the arm

was then about thirty-five degrees, whereas the plate taken following the setting of the arm showed it to be at about 20 degrees, in an "acute state of flexion," meaning that it was "bent as far as you can bend it normally." This reduction of the angle of flexion was accomplished at the boy's first visit to respondent following the reduction, and at several other visits later.

The boy was examined almost every day for the first week following the accident, and thereafter, until August 21, about twice a week. The mother testified that about two weeks after the arm had been set she asked respondent "why the boy was not able to move his fingers, and his hand looked sort of blue, and the Doctor said there was not anything wrong with the hand; that on August 21 she again called respondent's attention to the boy's fingers, and he said, "Hasn't he been able to move them?"; that she replied, "No, I thought you knew;" and that as a result of the ensuing discussion, respondent called on Dr. Bloom, a bone specialist, to take over the case. The latter testified that when the boy was first examined by him on August 21st he had a healing or healed fracture of the upper arm with a "Volkmann's contracture" of the left forearm; that the characteristics of the contracture were visible in a claw hand, and a considerable wasting of the muscles which draw the hand to make a fist; that the boy definitely had no control over his fingers.

As a result of treatment from Dr. Bloom, the boy at the time of trial had approximately twenty-five-degree movement of his fingers. The contracture was of a definite and permanent nature and, after August 21, 1941, was susceptible only to remedial treatment, to which it has partially responded.

Petitioners alleged that respondent was negligent (1) in binding the area so tightly as to stop blood circulation, thereby bringing about the contracture; (2) in not examining the arm and in not loosening the bandage when notified some four hours after setting the arm that it was blue and his fingernails purple; and (3) in failing to recognize or treat the contracture between July 16 and August 21, when Dr. Bloom took over the case.

In his judgment the trial court recited that he had instructed a verdict because petitioners had failed to support their allegations of negligence "with proper or sufficient expert testimony showing negligence on the part of the defendant Bourdon, and had failed to show that defendant's negligence, if any, was the proximate cause of plaintiff's injury and damage."

■ It is definitely settled with us that a patient has no cause of action against his doctor for malpractice, either in diagnosis or recognized treatment, unless he proves by a doctor of the same school of practice as the defendant: (1) that the diagnosis or treatment complained of was such as to constitute negligence and (2) that it was a proximate cause of the patient's injuries. Kaster v. Woodson (Civ. App.), 123 S. W. (2d) 981 (er. ref.) ; Floyd v. Michie (Civ. App.), 11 S. W. (2d) 657; Kootsey v. Lewis (Civ. App.), 126 S. W. (2d) 512; Barker v. Heaney et al (Civ. App.), 82 S. W. (2d) 417 (er. dism.) ; Phillips v. Wright (Civ. App.), 81 S. W. (2d) 129 (er dism.) ; Urrutia v. Patino (Civ. App.), 10 S. W. (2d) 582 (er. dism.)

■■ As a circuit judge in Ohio, Chief Justice Taft clearly stated the principle, with the reasons supporting it, in these words: "When a case concerns the highly specialized art of treating (disease), with respect to which a layman can have no knowledge at all, the court and jury must be dependent on expert evidence. There can be no other guide, and, where want of skill or attention is not thus shown by expert evidence applied to the facts, there is no evidence of it proper to be submitted to the jury. Again, when the burden of proof is on the plaintiff to show that the injury was negligently caused by defendant, it is not enough to show the injury, together with the expert opinion that it might have occurred from negligence and many other causes. Such evidence has no tendency to show that negligence did cause the injury." Ewing et al v. Goode, 78 Fed., 442. And, if his is a recognized school of good standing with established rules and principles of practice for the guidance of its members, the accused doctor "is entitled to have his treatment of his patient tested by the rules and principles of the school of medicine to which he belongs, and not by those of some other school, because a person professing to follow one system or school of medicine cannot be expected by his patient to practice any other, and if he performs the treatment with ordinary skill and care in accordance with his school of practice, he is not answerable for bad results." 41 Am. Jur., p. 203, sec. 85, citing Floyd v. Michie, supra. See, also, 48 C. J., p. 1118, sec. 104.

These principles are undoubtedly supported by the great weight of authority, and nearly all later cases cited Ewing et al v. Goode, supra. In Wigmore on Evidence, Vol. VII, p. 453, sec. 2090, is this statement: "It happens, however, that in one class of cases, viz., *actions against a physician or surgeon for malpractice*, the main issue of the defendant's use of suit-

able professional skill may be a topic calling for expert testimony only; and also that the plaintiff in such action often prefers to rest his case on the mere facts of his sufferings, and to rely upon the jury's untutored sympathies, without attempting specifically to evidence the defendant's unskillfulness as the cause of those sufferings. Here the Courts have been obliged to insist on the dictate of simple logic, resulting from the principle above cited, that expert testimony on the main fact in issue must somewhere appear in the plaintiff's whole evidence; and for lack of it the Court may rule, in its general power to pass upon the sufficiency of evidence, that there is not sufficient evidence to go to the jury. In actions for malpractice, therefore, something like a rule-of-thumb has been recognized in most jurisdictions." And in the supporting footnote are cited decisions by the highest courts in 27 states (other than Texas) as well as by courts of the United States and Canada. See, also, Annotation, 59 A. L. R., p. 884.

Since both negligence and proximate cause must be so proved, we do not decide whether there is any competent evidence of negligence in respondent's treatment of the fractured elbow but pass to the issue as to whether there is any medical testimony to show that the treatment given was a proximate cause of the contracture in question. And to determine that question in the light of the narrow rules applicable to cases like this, we have made a detailed study of the statement of facts, taking petitioners' testimony as true.

■ In their questioning of respondent as well as of their own witnesses, Drs. Bloom and Lerner, petitioners read a number of excerpts from standard medical authorities and now urge them as evidence of proximate cause. Since these statements must be excluded from consideration as evidence it is unnecessary to quote them. When a doctor testifies as an expert relative to injuries or diseases he may be asked to identify a given work as a standard authority on the subject involved; and if he recognizes it, excerpts therefrom may be read not as original evidence but solely to discredit his testimony or to test its weight. Gulf, C. & S. F. Ry. Co. v. Farmer, 102 Texas, 235, 115 S. W., 260; Texas & P. Ry. Co. v. Hancock, 59 S. W. (2d) 313 (er. ref.). They cannot be taken as sustaining the issues in a case. Fort Worth & R. G. Ry. Co. v. Woodward (Civ. App.), 254 S. W., 227 (er. ref.), citing Missouri K, & T. Ry. Co. of Texas v. Robertson (Civ. App.), 200 S. W., 1120. This is the great weight of authority; in fact, only in Alabama are medical books admissible to prove their own statements. 20 Am. Jur. p. 816,

sec. 968. The reasons for this "usual rule are because of the unsettled condition of the sciences themselves; because the language employed is technical and hence not within the understanding of men of common experience; because of the difficulty of determining what books are or are not of good and established authority; because such books are written without the sanction of an oath, and the authors are not liable to cross-examination; and lastly, because such books are but hearsay evidence of matters about which living witnesses could be called to testify." 32 C. J. S., p. 627, sec. 718.

The other testimony offered by petitioners to show probable cause came from Drs. Bloom and Lerner; and the effect of it is that too tight bandaging *could* cause the contracture that the little boy suffered in this case, that it was one of several things that might have caused his trouble. For example, at one point in his direct examination by petitioners' counsel, Dr. Bloom testified as follows:

"Q. What is the cause of Volkmann's Contracture?

"A. That is still debated by certain authorities. The theory first conceived is that it was a blockage of veinous return rather caused by congestion of blood in the muscles, but the more recent writings indicate that it may be due to an ischemia or lack of blood supply.

"Q. That is from arterial sources?

"A. Lack of arterial blood supply.

"Q. In either event, there must be a cutting off of either the veinous return or arterial blood supply, isn't that true?

"A. Yes, sir.

"Q. From your experience, would you say that constriction or cutting is usually found in cases where too tight bandages have been applied and maintained, or from other causes?

"A. You say 'usually'?

"Q. Yes.

"A. Well, *the usual, I wouldn't know, but that could cause it.*

"Q. That could cause it?

"A. Yes." (Italics ours.)

Then, in answer to a hypothetical question embracing petitioners' theory of the case including absence of pulse before the setting and bandaging and a pulse that could be felt after the setting, Dr. Bloom testified: "From those facts, I think you could assume that the blood supply had been damaged at the time of the accident, if there was no radial pulse immediately after the accident. That one fact would lead you to believe

that there was probably enough damage to bring on Volkmann's contracture at the time of the accident." Then he said that assuming there was no pulse before the reduction but that it could be felt after the elbow was set, the "proper procedure under good medical practice" was "a reduction of the fracture and maintaining it in a position of flexion."

After explaining this testimony on cross examination and then on re-direct examination, Dr. Bloom testified on recross examination:

"Q. As I understand the opinion you originally expressed with reference to this particular case was that it was probable that sufficient damage was done at the time of the original injury, as evidenced by the absence of the radial pulse, to have caused the contracture?

"A. Yes, that would be a good supposition.

"Q. And that may have ensued regardless of any treatment that was given?

"A. Yes, sir.

"Q. Now, in addition to the traumatic cutting off of the arterial flow, are there not some other causes, some other things that can happen that may cause Volkmann's contracture, such as a traumatic arterial spasm?

"A. Yes, sir.

\*    \*    \*    \*    \*

"Q. Now about a thrombosis or embollism?

"A. Thrombosis is the filling up of the blood vessels by a clot of blood. Embolism is a clot floating around which lodges in the blood vessel.

"Q. How about perforation or rupture of the blood vessels?

"A. Yes, that would bring it on."

Again, after giving his opinion that the cause originated after the arm had been set, Dr. Bloom expressed the further opinion that regardless of the time the blockage of blood vessels occurred, the thing that caused the blockage "could well have been and probably was" at the time of the original accident.

Dr. Lerner first saw the Bowles boy on Oct. 14, 1947. He studied X-ray pictures made soon after the elbow was broken and examined the boy. He was so consulted with the purpose on the part of petitioners to use him as a witness but he did not know of that purpose until after he had completed his examination and made his findings. All of his testimony was given on direct examination. When asked "whether or not there are othere causes in addition to a tight bandage that may cause a

Volkmann's contracture", he answered: "Well, of course, a tight bandage would be one. That is impairment of either the veinous return or arterial flow. Then in any break you have to start of course, a clot, and you may have—there are certain fascias or different membranes that you have in the elbow and arm where sometimes a clot will come along there and cause a pressure and impair the circulation. Of course, there is a consideration of the fracture either traumatizing, that is injuring the blood vessels, or perhaps pressing on the blood vessels themselves. Those are things we have to consider."

In response to a hypothetical question substantially embracing the facts from petitioners' standpoint and inquiring "whether or not, in your opinion, the Volkmann's contracture occurred after the fracture was reduced or before", Dr. Lerner said: "If this blueness and coldness and swelling took place following the cast or bandaging, I would say it was after the bandaging. If it was present when he first came, and before this circulatory difficulty was manifested, before the reduction, then I would say certainly that (sic) was the contributing factor to the Volkmann's contracture."

The last question asked him related to Volkmann's contracture and it was whether "the medical profession has a well recognized technique or method or manner of preventing it and treating it". His reply was: "Well, of course, I am getting back to what I have said. It is due to a circulatory impairment and the first thing to do is to try to establish good circulation, the best you can. That doesn't mean that after you have done all you could, you still may get a Volkmann's contracture. You can incise them, open them and remove all of the pressure, and it is still possible to get a Volkmann's contracture, but you attempt to establish circulation the best you can."

We do not find in the testimony we have recounted or elsewhere in the statement of facts any competent evidence that the negligence, if any, of respondent either in binding the boy's arm or in its subsequent treatment was a proximate cause of the contracture suffered by the patient. All it shows is that what respondent did was not a probable but only a possible cause of the contracture; that it was only one of several things that *could* have caused the injuries complained of. Therefore, this cause is ruled by the language of Circuit Judge Taft, in Ewing et al v. Goods, supra, "When the burden of proof is on the plaintiff to show that the injury was negligently caused by defendant, it is not enough to show the injury, together with

the expert opinion that it might have occurred from negligence and many other causes. Such evidence has no tendency to show that negligence did cause the injury."

And if the plaintiff would rest upon inferences rather than upon direct evidence, he meets the same rule. "The proof must establish causal connection beyond the point of conjecture. It must show more than a possibility. Verdicts must rest upon reasonable certainty of proof. Where the proof discloses that a given result may have occurred by reason of more than one proximate cause, and the jury can do no more than guess or speculate as to which was, in fact, the efficient cause, the submission of such choice to the jury has been consistently condemned by this court and by other courts." Ramburg v. Morgan 209 Iowa 474, 218 N. W., 492.

Accordingly both judgments below are affirmed.

Opinion rendered March 16, 1949.

### ON REHEARING.

MR. JUSTICE BREWSTER delivered the opinion of the Court.

Having again carefully studied the statement of facts and other relevant parts of the record in considering petitioners' earnest and able motion for rehearing, we find it necessary to write on some propositions urged by them in connection with our holding that standard medical authorities cannot be taken as original evidence.

In our original opinion we said, "In their questioning of respondent as well as of their own witnesses, Drs. Bloom and Lerner, petitioners read a number of excerpts from standard medical authorities and now urge them as evidence of proximate cause." Petitioners say that nowhere in the course of this appeal have they relied on any quotation from any medical authority read to Doctors Bloom and Lerner to establish proximate cause but have urged for that purpose only excerpts from medical authorities read to respondent. We accept the correction.

■ Petitioners now urge three of these excerpts and say that since respondent, an adverse witness, agreed with them they amounted to admissions and therefore became competent evidence of proximate cause. We shall deal with only two of these because the third clearly relates not to proximate cause but only to the issue of negligence.

One such quotation was embraced in the following question to respondent and his answer:

"Q. On page 610 of your text, which your attorney has kindly loaned me, that is, Key and Conwell on Fractures, Dislocations and Sprains, third edition, there appears this statement. That is with reference to diagnosis. 'In a typical case there is a history of a fracture usually at the elbow, which has been treated by tight splints, bandages or cast, and (in) which intense pain and swelling had followed the treatment. As a rule the contracture is not noted early, but becomes evident after the dressings have been removed and continues to progress over a period of months and may reach such a degree that the strongly flexed fingers press into the palm of the hand and cause pressure sores.' Do you agree with that?"

"A. Yes, assuming that a too tight cast has been applied."

Petitioners say that this "yes" must be taken without qualification since there was testimony that the bandage was too tight, under the rule that their testimony must be accepted as true in testing the correctness of the trial court's action in instructing a verdict. Be that as it may, we know of no rule of law which would render one isolated question and answer an admission when the absolute contrary clearly appears from other questions and answers in the context. The five questions asked respondent and his answers thereto immediately following the question and answer above quoted are:

"Q. That is, the typical case or usual case of Volkmann's paralysis is caused by a too tight bandage?"

"A. No, sir, it says it is a possible case. You make that a general term, that it applies to a typical case."

"Q. I am reading from the text which says, 'In a typical case there is a history of a fracture, usually at the elbow, which has been treated by tight splints, bandages or cast, and in which intense pain and swelling followed the treatment.' Is that typical?"

"A. That could be typical but not necessarily so."

"Q. But that is usually the typical case?"

"A. It is a sample of a typical case, is that what you mean?"

"Q. No, I am asking you if—"

"A. (Interrupting) If it can happen?

"Q. No, I am asking if it is not the usual and customary cause of Volkmann's contracture, namely, tight bandage?"

"A. That used to be considered so, but it is not today."

In that state of the record it simply cannot be said that re-

spondent admitted the correctness of the quoted text. On the contrary, he expressly denied its correctness.

The other excerpt from a recognized medical authority relied upon by petitioners as constituting an admission by respondent appears in the following question and answer:

"Q. Do you agree with this statement: 'The dressing may not have been too tight when it was applied but the arm may have continued to swell and caused it to be too tight later. Consequently no physician or surgeon should apply a Bolar splint or circular bandage or cast to a forearm or place an elbow in acute flexion unless he can see or get a reliable report on the patient from four to twelve hours later and unless he can recognize the symptoms of Volkmann's ischemic paralysis on sight or when they are reported to him?' Do you agree with that statement?"

"A. Yes, sir."

Petitioners say: "The effect of the admission by Dr. Bourdon on the witness stand is to make that statement his statement. He admits it to be true." But we cannot agree to their conclusion, because of the questions and answers immediately following those just quoted. They are:

"Q. Do you agree with the statement from four to twelve hours later?"

"A. Well, it said if there was a report from some one that observed it."

"Q. You just read it here.

"A. Well, this child didn't have a Bolar splint, nor did he have a circular bandage. And it says a reliable report on the patient. I think that is correct."

"Q. This bandage, you say, was not what you call a Bolar splint?"

"A. Yes, sir.

"Q. Wouldn't that same statement hold true with reference to the bandage you put on this arm?"

"A. No, sir, because a circular cast or bandage would go completely around each member, where the reduction I put on each side, going across, not around, as they were previously described. There were strips of adhesive that would be enough to hold the upper and forearm in approximation, but they did not go completely around."

Respondent cannot be held to have admitted bad effects growing out of the use of a Bolar splint or a circular bandage

when he said in the very next breath that he had used no such splint or bandage and asserted that the statement in question was not true as to the bandage he did use.

Petitioners' motion for rehearing is overruled.

Opinion delivered April 27, 1949.