**LONE STAR GAS CO.**

v.

**DENTON et ux.**

No. 3201.

Court of Civil Appeals of Texas.

Waco.

June 29, 1954.

Rehearing Denied July 22, 1954.

Thompson, Knight, Wright & Simmons and W. B. Allen, Jr., Dallas, for appellant.

J. Webb Stollenwerck, Hillsboro, Ralph Norvell, Jr., Waco, for appellees.

TIREY, Justice.

Appellees brought this suit against appellant for damages on account of the loss of four shade trees, their suit being grounded on alleged negligence of appellant's agent in permitting propane gas to escape into the limbs and branches of the trees while filling a tank with propane gas. The jury in its verdict found that the death of the trees was not caused by an unavoidable accident; that gas escaped from the storage tank of the plaintiffs into their trees; that such gas escaped from said storage tank because of the negligence of appellant's agent and that such negligence was the proximate cause of the death of the trees. The jury awarded appellees the sum of $400 for their loss. The court overruled appellant's motion to disregard the answer of the jury to Special Issue No. 4 and granted appellees' motion for judgment. Appellant assails the judgment on two grounds: (1) "The court erred in over-ruling defendant's motion to disregard the jury finding in answer to Special Issue No. 4 and in overruling defendant's motion for judgment non obstante veredicto because there is no competent evidence of any probative force to support the finding that the escape of the propane gas was the proximate cause of the death of plaintiffs' trees." (2) "The court erred in overruling defendant's amended motion for new trial because the jury finding that the escape of propane gas proximately caused the death of plaintiffs' trees is not supported by sufficient evidence and is contrary to the overwhelming weight of the evidence."

Appellees' Counter Points are: "(1) The jury finding that the escape of propane gas was the proximate cause of the death of appellees' trees is supported by the evidence; (2) There is competent evidence of probative force that the escape of propane gas was the proximate cause of the death of appellees' trees."

In appellant's brief we find substantially this statement: Plaintiffs owned their home in Woodbury, Hill County. A road ran north and south in front of their house which faced west. Running parallel with the south side of the house were three hackberry trees, these trees being about 30 feet south of the house. Between the house and the tree farthest east was located plaintiffs' propane storage tank. The distance between each of these three trees was about 10 feet. A fourth tree was located in front of plaintiffs' house, right at the edge of the road, which was about 40 feet from the storage tank.

On July 28, 1952, appellant's propane gas delivery man drove his filler truck to plaintiffs' home for the purpose of filling their storage tank, arriving about 1:00 P.M. He drove his truck up to the storage tank and found that it contained 125 gallons of propane and proceeded to fill it to its normal capacity of 425 gallons. In order to fill the tank, the agent connected two valves on his truck to two similar valves on the customer's storage tank by means of two hoses. The "filler

valve" on the customer's tank is the one through which the gas is transmitted from the truck tank. The other valve, called the "equalizer valve", about ¾ inches in diameter, serves the purpose of equalizing the pressure between the customer's tank and the truck tank. No defect existed in and no gas escaped from the filler valve or its connecting hose on the occasion in question; but after filling the tank and as he began to unscrew the hose connected to the equalizer valve the agent noticed that some vapor started coming out and he realized that a defect existed in the equalizer valve. The foregoing recitations appear to be without dispute.

The testimony is conflicting concerning the length of time that the propane vapor escaped from the equalizer valve.

Mrs. Denton testified to the effect that she was sitting in her southeast bedroom by the window while the agent was filling the storage tank and observed that the agent broke the valve. She said he left and was away for a period of 25 or 30 minutes, and that gas was escaping during this time.

Lewis, a cousin of Mr. Denton, who lives about 150 yards northwest from the Denton home, testified that he walked out the back door of his house and saw a man holding a hose on the north side of the trees "pretty close" to the Denton storage tank, but he did not know whether gas was getting on all of the trees or just one tree. Mr. Lewis testified that he could smell the fumes but could not see them.

The witness Corpier, a neighbor of the Dentons, whose house is 75 or 80 yards from the Denton home, testified that he was out at his barn when he heard a "spewing noise" and that he observed the fumes going through the branches of the Denton trees for a period of 15 or 30 minutes; that the best he could tell the fumes were coming from the Denton storage tank and that they were blowing in a westerly or northwesterly direction.

Mrs. Denton also said that the trees began to die in three days. Mr. Denton said that within a few days after July 28th, the leaves were dead and began to shed, that he broke some of the limbs and found that there was no live sap in them, and found that they began to die within three days.

The witness Lewis stated that the trees were dying about two weeks after the propane vapor escaped.

The appellants' agent testified that he disconnected the hose to the equalizer valve, and attempted to pull the small pin in the center of the valve back up in place with a pair of pliers that he carried for that purpose; that after he was unable to do so, he immediately screwed the connecting hose back on the equalizer valve and tightened it down so as to stop the flow of vapor, and he estimated that vapor escaped no longer than ten seconds while he had the equalizer hose disconnected; appellant's agent further testified to the effect that he turned the cutoff on the equalizer off and disconnected the end attached to his truck and left the appellees' tank with no gas escaping and drove to a nearby store to make a telephone call to his foreman in Hillsboro in order to have an equalizer valve and a long hose brought out to the Denton residence; that in about thirty minutes the equipment arrived and during this interval he filled another customer's tank and then returned to the Denton residence; that after his foreman arrived with the new equalizer valve and drainage hose they made some examination of the Denton tank and at the time of their arrival the Denton storage tank still contained 425 gallons of propane gas and that no gas was escaping; that they then proceeded to pump all but about 5 or 10 gallons from the Denton storage tank into the filler truck; that they did this to release completely the pressure from the storage tank and that in doing so they stretched a 49 foot hose out to the edge of the road in front of the Denton residence, west of the trees, and let vapor escape from the end of the hose; that the vapor was blowing away from the trees and that none of it got on any of the four trees; they also said that the hose reached

the edge of the road in front of the Denton home, out beyond the trees here in question.

Testimony was also tendered to the effect that Hill County, including the Denton residence, experienced an extreme drouth in the summer of 1952; that plaintiffs' witness Hickey, a florist, testified that "the summer of '52 was an extremely dry, hot summer, one of our worst the best I remember"; that hackberry trees would be damaged or killed by a prolonged drouth and heat and that "you could drive down most any highway and see dead trees that were not there before," and in his field there were two pecan trees that he lost that he attributed to the drouth. He said that the roots of hackberry trees have a tendency to spread out; they do not have too long a tap root, as does a pecan tree, and that all things being equal he would think that a hackberry tree would be more liable to die as a result of dry weather than a pecan tree.

Mrs. Denton admitted that the trees in question had mistletoe in them and after the witness Hickey described the effect of mistletoe on trees, he testified as follows: "I would say in the absence of rain and the mistletoe it could definitely be killed and that the mistletoe would be a contributing factor."

Witness Lewis further testified that he knew how dry the weather was in the summer of 1952 and admitted that "I have seen a few trees dying in the last year or two, I have got some right across in front of my house."

The witness Corpier said that he knew only two hackberry trees that died in the Woodbury community in the summer of 1952, but he did know of some elm trees that died about a mile and a half or two miles north of Woodbury, although he could not give any estimate as to the number.

Witness Bigham, tendered by defendant, said that he recalled that a number of trees died on his land near the community of Woodbury in the summer of 1952; that J. H. Duke and Orville Holliday, employees of defendant, both testified that they observed that numerous trees died around Woodbury during that summer.

The witness Holliday said that after the controversy with the Dentons arose, he sprayed 10 or 15 gallons of propane gas on growing cotton to determine whether it would defoliate the cotton in response to a request by a local farmer. The cotton was observed after it had been sprayed, and Mr. Holliday testified that it did not die. (End of statement taken from appellant's brief).

We find that evidence was also tendered to the effect that at the time the gas escaped the trees were in good foliage and apparently healthy; that the gas escaped and went through the trees and that within three days thereafter the foliage looked like it had been frozen. One witness said that within two or three days the trees looked like frost had hit them and that they were dead, with no living sap in the limbs when broken; one witness who saw the gas escaping through the branches and observed the trees thereafter said that it was his opinion that the trees were killed by the gas.

Appellant in its brief says: Where two or more possible causes of particular damage exist, for only one of which a defendant is responsible, there must be competent and direct evidence to show that the cause for which a defendant would be liable was more reasonably probable than the others, and a showing of the damage alone, without any connecting evidence, is of no probative value whatsoever. The record in this case is completely void of evidence that would tend to show the effect of propane vapor, or that it was even a possible cause of the death of the trees." We are not in accord with this view.

It is true, we have no scientific evidence tendered by either side in this cause as to what effect the propane gas released through the air would have on the foliage of the trees through which it passed. It is true that two of appellant's witness-

es, who were not scientific men, said they had experimented with the effects of propane gas on cotton and that it did not cause cotton to lose its foliage. On the other hand, we have appellees' testimony to the effect that the trees were in good foliage and that within a few days after the gas was released through the branches of the trees that the leaves looked like they had been frozen, and another witness said they looked as if they had been frostbitten and the trees proceeded to die rather quickly. In this state of the record we think that the releasing of the propane gas authorized the jury to believe and find that there was an unbroken and continuous sequence of events from the acts of negligence to injury on the part of defendant's agent in releasing the propane gas. Under all the facts here tendered, the releasing of the propane gas and its effect on the foliage of the trees and the further result of the death of the trees were facts testified to by witnesses within their personal knowledge, and under the foregoing factual situation it was for the jury to decide the issues tendered by the evidence of these witnesses.

 Our Supreme Court in Hood v. Texas Indemnity Co., 146 Tex. 522, 209 S.W.2d 345, held outright that "opinion testimony does not establish any material fact as a matter of law." See Points 1–3, of 209 S.W.2d at page 346. See also Missouri-Kansas & Texas R. Co. of Texas v. Anderson, Tex.Civ.App., 258 S.W.2d 375, pt. 5 at page 379, (N.R.E.). So, here we have the jury rejecting appellant's testimony to the effect that propane applied to cotton does not cause it to lose its foliage, but on the other hand adopted the testimony of appellees' witnesses that the escape of the propane through the branches of the trees caused the trees to lose the foliage thereon and finally resulted in the death of the trees. We see no conflict in the rule announced in the majority opinion in the Hood case, supra, with the rule announced by our Supreme Court in Bowles v. Bourdon, 219 S.W.2d 779. We think under the record here made the jury was authorized to find that the escape of the

propane gas was a proximate cause of the death of appellees' trees and that such evidence was of competent probative force. Since appellant complains of the action of the trial court in refusing to grant its motion for judgment non obstante veredicto, we think the rule stated by our Supreme Court in Burt v. Lochausen, Tex. Sup., 249 S.W.2d 194, 199 is of peculiar significance here. The rule there stated is: (a) " * * * to sustain the action of the trial court in granting judgment non obstante veredicto, it must be determined that there is no evidence having probative force upon which the jury could have made the findings relied upon." (Citing cases.) (b) " 'It was the jury's province to weigh all of the evidence, to decide what credence should be given to the whole or to any part of the testimony of each witness. "The jury were the judges not only of the facts proved, but of the inferences to be drawn therefrom, provided such inferences were not unreasonable." ' " (Citing cases.)

 Needless to say, this case has given us some concern because of the absence of scientific testimony as to what effect propane gas released through the branches and foliage of trees would have thereon, but under the record here made and under the rule announced in Hood v. Texas Indemnity Co., supra, we think that the jury had the right to make the findings it did, due to the fact that these witnesses were testifying to facts they saw and observations they made, and we cannot say that the evidence is without probative force. It is our view that the testimony of the witnesses here tendered falls within the rule of opinion evidence from unskilled persons who are allowed to state their opinion in conjunction with all attendant circumstances relevant to the opinion when there is a showing that they are familiar with the surrounding circumstances. There is an excellent statement of this rule by the Supreme Court of Conn. in Porter v. Pequonnoc Mfg. Co., 1845, 17 Conn. 249. This case was cited with approval and followed by our Supreme Court in International & G. N. R. Co. v. Klaus, 1885, 64 Tex.

293. We think our views here are also in accord with Gulf, C. & S. F. R. Co. v. Haskell, 1893, 4 Tex.Civ.App. 550, 23 S.W. 546.

Being of this view, the judgment of the trial court is affirmed.