Charlotte KINION and Steve Kinion, Appellants,

v.

Robert F. HYDE, Appellee.

No. 8184.

Court of Civil Appeals of Texas, Amarillo.

Oct. 4, 1971.

Rehearing Denied Oct. 26, 1971.

Herbert C. Martin, Amarillo, for appellants.

Stone, Stone & Chambers, John C. Chambers, Amarillo, for appellee.

REYNOLDS, Justice.

Charlotte Kinion and her husband, Steve Kinion, brought this medical malpractice suit against Dr. Robert F. Hyde. The trial was to a jury, but at the conclusion of plaintiffs' evidence, the trial judge instructed the jury to return a verdict for the defendant. From the judgment entered on the instructed verdict, plaintiffs have appealed. We affirm.

Essentially, plaintiffs' 19 separate causative negligence allegations in the trial

court, and their four points of error on this appeal, accuse Dr. Hyde of malpractice in his treatment, diagnosis and premature release of Mrs. Kinion. It is axiomatic that for this medical malpractice suit to have reached the jury, plaintiffs were required to present competent evidence by a doctor of the same school of practice as Dr. Hyde that (1) the treatment or diagnosis or premature release complained of was negligence, and (2) such negligence was a proximate cause of Mrs. Kinion's injuries. Bowles v. Bourdon, 148 Tex. 1, 219 S.W.2d 779 (1949). In resolving whether plaintiffs presented competent expert evidence of negligence and proximate cause sufficient to escape the instructed verdict against them, the evidence must be viewed and interpreted in the light most favorable to plaintiffs, disregarding all evidence and the inferences therefrom favorable to the defendant. Hart v. Van Zandt, 399 S.W. 2d 791 (Tex.Sup.1965).

A statement of the evidence is necessary. Mrs. Kinion fell at her home on November 14, 1969, and broke a bone in her right wrist. Upon admittance to the hospital, the x-ray of the wrist revealed a fracture of the distal head of the radius bone that is just behind the thumb, medically termed a comminuted Colles' fracture. Dr. Hyde, an orthopedic surgeon, reduced the fracture, x-rayed the setting, and placed the wrist in a cast to immobilize the bones until they could unite. The cast was placed so that the hand was bent down as far as possible and tilted away from the body, a position that frequently causes pain and discomfort to the patient. The wrist was then x-rayed and the radiologist who interpreted this x-ray reported an "excellent position and alignment."

After her release from the hospital, Mrs. Kinion visited Dr. Hyde's office on November 21, complaining of pain. An x-ray was taken and medication for pain was prescribed. On the following visit on December 1, another x-ray was made since the pain continued. Dr. Hyde's opinion from viewing the x-rays was that they revealed an anotomical alignment and excellent reduction of the fracture that a specialist in orthopedic surgery would hope to achieve in accordance with the medical standards prevailing in the community. Because of Mrs. Kinion's continued complaints of pain, Dr. Hyde opened the cast on December 9 to make a visual examination of the skin. No pressure sores were found. On December 18 another x-ray was made from which Dr. Hyde determined there was a satisfactory position of the bones. The posterior half of the cast was removed, the anterior portion being retained with a bandage. The pain endured and Mrs. Kinion was next seen by Dr. Hyde on January 6, 1970, at which time the cast was removed. An x-ray taken at that time revealed to Dr. Hyde a continued anotomical alignment and absorption of the injured bone.

Following removal of the cast, Mrs. Kinion's pain remained and she was unable to raise her wrist. The pain was no more severe than Dr. Hyde would expect; his examination and x-rays indicated no cause for the pain other than the pain of the fracture itself and the limitation of motion, which could be regained only by proper rehabilitation exercise, which he prescribed. Mrs. Kinion performed the exercise. The pain persisted. Dr. Hyde saw Mrs. Kinion on January 27. She was able to get her hand straight, but she still had marked limitation in the ability to turn the arm and palm up. The circulation was good and the skin was clear.

Dr. Hyde released Mrs. Kinion to normal activity on April 20, 1970. She had gained approximately the degree of motion Dr. Hyde would expect following the fracture. It was Mrs. Kinion's testimony that Dr. Hyde released her to normal activity and said there was no need for her to return, and that there was nothing else he could do. Dr. Hyde, on the day of release to normal activity, determined that an osteotomy—a surgical procedure, by the use of a chisel-like instrument to cut the bone in two, employed to rebreak the bone to

change the position—was not indicated and would not have been medically acceptable at that time.

Although Mrs. Kinion understood that she could call upon Dr. Hyde if her difficulty continued, she was dissatisfied and on June 10, 1970, consulted Dr. Kenneth Johnston, an orthopedic surgeon, complaining of pain and difficulty in moving her wrist. Dr. Johnston made an x-ray of the wrist at an angle different than shown in Dr. Hyde's x-rays. Dr. Johnston interpreted his x-ray to show "the large bone to be tipped down a bit more than it should be, producing a prominence of the smaller bone on the top of the wrist." This degree of tilt was not shown in Dr. Hyde's x-ray. The bone had healed satisfactorily, but in a position that was not satisfactory. Dr. Johnston found that Mrs. Kinion's wrist position would not be unusual if there were no pain. Dr. Johnston's opinion was that the pain was caused by the two bones not moving smoothly one on the other as they should. Since exercise had not caused the pain to cease, he would not expect it to do so with further exercise.

Because of Mrs. Kinion's persistent symptoms, Dr. Johnston performed an osteotomy, removing a small wedge of bone from the radius, about 1/16th of an inch wide at its base, to bring the wrist up. The pain ceased and the motion improved to some degree.

Dr. Johnston testified that he would not expect a completely healed bone to change in 60 to 90 days. If his x-ray on June 10 showed the same reduction as when the cast was removed in January, it was a medically acceptable reduction if the patient was comfortable with it. Examining Dr. Hyde's x-rays, Dr. Johnston found them to show a condition of alignment hoped to be achieved under standards of care prevailing in the community.

Dr. Johnston testified that he considered the tilt of the bone that was reflected in his x-ray and not in Dr. Hyde's x-ray to be the cause of the complaint he corrected by osteotomy. He further testified that following a fracture, the bone immediately adjacent to the fracture dies, the body absorbs the dead bone, and new bone is laid down which in time is absorbed and replaced by new bone mechanically stronger. This is a continuing day to day process throughout the life of the patient. The process might result in an increase in the tilt of the bone, and, on a day to day basis, it would be hard to tell the difference, and there is nothing the physician can do well to control the process. This process might account, Dr. Johnston opined, for the difference in the tilt of the bone as shown in Dr. Hyde's January 6, 1970, x-ray and Dr. Johnston's June 10, 1970, x-ray.

Dr. Johnston expressed the opinion that it was "probably not" good medical practice in the area to dismiss as cured one who was enduring intense pain and suffering from a wrist set. Immediately thereafter the following question and answer are recorded:

> "Q. Now, do orthopedic surgeons in this area, under the general practice, dismiss their patients even to normal activity when they are suffering intense pain and suffering from a wrist bone?
>
> "A. Well, in a situation like this, we would tell the patient to resume normal activities as much as possible, because quite often the wrist will become not painful and useful."

The doctor then stated that a complaint of pain would not prevent him from releasing a patient to normal activity.

Given a case of medically acceptable reduction, Dr. Johnston said that one does not consider an osteotomy for a period of some six or seven months after fracture; and that six months to a year is a reasonable time for osteotomy, within the discretion of the particular doctor. Based on the evidence, including the x-rays, Dr. Johnston would not have performed an osteotomy on April 20, 1970.

Plaintiffs contend that under the evidence they have discharged the lawful bur-

den imposed upon them, entitling them to a jury determination of negligence and causation. Plaintiffs' reasoning is that since both Dr. Hyde and Dr. Johnston are medical experts in the field of orthopedic medicine, the fact that Mrs. Kinion's pain and suffering terminated with Dr. Johnston's osteotomy reveals beyond question that her injuries were proximately caused by Dr. Hyde's improper reduction of the fracture, improper diagnosis that there was a proper reduction, and improper release of Mrs. Kinion without performing an osteotomy. In support of their contention, plaintiffs cite Snow v. Bond, 438 S.W.2d 549 (Tex. Sup.1969) and King v. Flamm, 442 S.W.2d 679 (Tex.Sup.1969).

The prevailing authorities compel us to disagree with plaintiffs. The *Snow* and *King* cases were summary judgment cases in which the defendant doctors had the burden of proving conclusively the absence of material and disputed issues of fact. In an instructed verdict situation such as is before us, there is a difference, and, as succinctly stated in Glenn v. Prestegord, 456 S.W.2d 901 (Tex.Sup.1970), "(t)he difference is fundamental and drastic." Here, the plaintiffs have the burden of proof required by Bowles v. Bourdon, supra. Accepting, as we must, all of the testimony favorable to plaintiffs and disregarding all other evidence, the result is no more than a mere surmise, suspicion or speculation that Dr. Hyde's treatment, diagnosis and release were improper. In such a situation, the jury will not be permitted to speculate. Hart v. Van Zandt, supra; 45 Tex.Jur.2d Physicians and Other Healers, § 134. This is for the reason that in a case concerning the highly specialized art of medical treatment of which a layman can have no knowledge, there must be expert evidence of want of skill and attention before it is proper to submit the case to a jury. Bowles v. Bourdon, supra.

The record before us is devoid of expert evidence of improper treatment, diagnosis or release by Dr. Hyde. He made no such admission. Dr. Johnston did not testify to any want of skill or attention on the part of Dr. Hyde. To the contrary, Dr. Johnston testified that Dr. Hyde's alignment of Mrs. Kinion's fracture was in a condition hoped to be achieved under standards of care prevailing in the community; that in a situation like this, he would tell a patient to resume normal activities; and that he would not have performed an osteotomy on Mrs. Kinion on April 20, 1970, the day Dr. Hyde released her to normal activity.

Furthermore, Dr. Johnston's testimony was that the process of the bone dying, being absorbed and being replaced by new bone might account for the tilt in the bone which was corrected by his osteotomy. Even assuming that what Dr. Hyde did or did not do could have caused the injuries Mrs. Kinion complained of, plaintiffs still have not met their burden of proof. The expert testimony that the mentioned process might have caused the injuries destroys any tendency to show that negligence caused the injury. Bowles v. Bourdon, supra.

Further assuming that the evidence most favorable to the plaintiffs is that Dr. Hyde prematurely released Mrs. Kinion in view of her complaints of pain, yet plaintiffs' evidence also is that the bone absorption process might have accounted for her complained of injuries. Thus where the evidence most favorable to plaintiffs develops more than one equally probable cause, and one for which the accused doctor is not responsible, plaintiffs have failed to sustain their burden of proof on the essential element of causation. 13 A.L.R. 2d 22; Hart v. Van Zandt, supra; Bowles v. Bourdon, supra.

Since plaintiffs failed to meet their burden of proof as to either negligence or proximate cause, the instructed verdict was proper and correct. The judgment of the trial court is affirmed.