William A. KING et ux., Appellants,

v.

Kenneth R. FLAMM, Appellee.

No. 7879.

Court of Civil Appeals of Texas.

Amarillo.

Oct. 28, 1968.

Rehearing Denied Nov. 25, 1968.

**198**

------♦------

Lockhart, Lindsey & Neal, Amarillo, Connally Lockhart, Amarillo, of counsel, for appellants.

Stone, Stone & Chambers, Amarillo, John C. Chambers, Amarillo, of counsel, for appellee.

CHAPMAN, Justice.

This is an appeal from a summary judgment rendered for Kenneth R. Flamm, M. D. in a medical malpractice case. William A. King and his wife, Mary Louise King as plaintiffs, sought recovery against Kenneth R. Flamm, M. D. for damages for physical injuries to Mary Louise King proximately resulting from an incorrect diagnosis and treatment of her, alleging pain and suffering due to such improper diagnosis and treatment, deprivation of her services to William A. King and their children, loss of salary, medical expenses, etc.

Summary judgment components in the record are depositions of Drs. Flamm and Charles Patrick Oles, M. D.'s, Mary Louise King and William A. King; and affidavits of each of the named M. D.'s, Tom W. Duke, M. D., John J. Walker, M. D. and Mary Louise King.

Numerous grounds of negligence were alleged in improper diagnosis and treatment by Dr. Flamm and of failure and/or refusal, after repeated requests of plaintiffs to call in another doctor or doctors for examination and consultation concerning Mary Louise King's illness.

■ In determining negligence as it relates to the highly specialized art of diagnosis and treatment of diseases the court and jury must be dependent on expert testimony [1] by a doctor of the same school of practice as the defendant [2] except where the particular subject of inquiry is common to and equally recognized and developed in all fields of practice.[3] The stated exception is immaterial to our inquiry for the reason that all affidavits by and depositions of experts were M. D.'s trained in the same field of practice as appellee and additional residency training in their respective fields of practice. Our Supreme Court in Hart v. Van Zandt, supra, has also stated:

"The burden of proof is on the plaintiff to show that the injury was negligently caused by the defendant and it is not enough to show the injury together with the expert opinion that it might have occurred from the doctor's negligence and from other causes not the fault of the doctor. Such evidence

1. Hart v. Van Zandt, 399 S.W.2d 791 (Tex.Sup.1966).

2. Bowles v. Bourdon, 148 Tex. 1, 219 S.W. 2d 779, 13 A.L.R.2d 1 (1949).

3. Porter v. Puryear, 153 Tex. 82, 262 S.W.2d 933 (1954).

has no tendency to show that negligence did cause the injury."

■ This appeal being from a summary judgment, there are also other well settled principles of law by which we must be guided in determining if plaintiffs discharged their burden with respect to the questions of negligence and proximate cause. All doubts as to the existence of a genuine issue as to a material fact are resolved against the movant. Great American Reserve Ins. Co. v. San Antonio Plumbing Supply Co., 391 S.W.2d 41 (Tex. Sup.1965). The court's task is analogous to that which he performs on a motion for directed verdict,[4] in that he accepts as true all evidence of the party opposing the motion which tends to support such party's contention, and gives him the benefit of every reasonable inference which properly can be drawn in favor of his position. Gulbenkian v. Penn, supra; Womack v. Allstate Insurance Co., 156 Tex. 467, 296 S.W.2d 233 (1956). All conflicts in the evidence must be disregarded, and the evidence which tends to support the position of the party opposing the motion is accepted as true. Great American Reserve Ins. Co. v. San Antonio Plumbing Supply Co., supra.

On September 2, 1966, Mary Louise King was placed in Northwest Texas Hospital by Dr. Flamm upon complaint of muscular pains throughout different parts of her back and upper limbs. Drs. Charles Sadler, an orthopedic surgeon, was called in on her case. He tried conservative treatment such as traction but soon decided surgery was necessary to correct a broken fusion from a previous back fusion. She was operated September 23, 1966. Dr. Flamm visited her only as a family physician during convalescence at the hospital from the laminectomy performed by Drs. Sadler and Ellis, the latter a neurosurgeon. She was discharged from the hospital on October 12, 1966, with instructions not to get out of the house except "to do a little bit of walking."

On November 6, she awoke with a pain in the left side of her chest, which continued throughout the day. She called appellee at his home and he advised her to take a Darvon capsule (a mild painkiller). The pain having continued, she saw Dr. Rowley (appellee's associate) on November 7. Dr. Flamm was out of town at the time. She was X-rayed and diagnosed of pleurisy, administered terramycin and given a prescription for the drug in capsule. On November 8, 9 and 10 the chest pain continued with fever, but with no coughing. On November 11, she coughed up a tremendous clot of blood. It was not bright red, not brownish red, but a deep color red. She called appellee and advised him of the hemoptysis.[5] He told her it was not coming from the lungs and was nothing to worry about. She coughed up blood occasionally for the next few days. Her pain continued but she had no fever.

On November 17, she experienced a temperature of 101°. She called Dr. Flamm again and he prescribed another antibiotic. On November 20, she awoke at 5.00 A.M. in extreme pain, with temperature of 101½° to 102°. He had her admitted to St. Anthony's Hospital and X-rayed. Upon admission to the hospital she had high fever and painful and rapid respiration. Dr. Flamm's admission diagnosis, dictated on December 5, was: "Bronchial pneumonia, right chest. Final: Pneumonia right middle lobe. Pleurisy with affusion at both bases." During this hospitalization Mrs. King coughed up dark clots of blood three times. Her temperature became normal with treatments of antibiotics and on December 5, she was discharged with instructions to do no housework.

4. Gulbenkian v. Penn, 151 Tex. 412, 252 S.W.2d 929 (1952).

5. This blood expectoration (in the depositions) is spelled throughout by the scrivener as "hematemesis."

She did very well for a few days at home and then on December 18, "suddenly had the terrible pains and the coughing of blood again." She called Dr. Flamm and he sent her out more terramycin. She continued the hemoptysis "at least once a day if not more than that." The week following December 18, she took her own temperature each day and found she had some fever but it gradually diminished and by December 25, she was feeling "pretty good." She went to see appellee on the 30th or 31st of December and was told her X-ray showed her lungs had cleared up considerably but not completely. He told her she could go back to her legal secretarial work after the Christmas holidays. She went back to work on January 2, and on the next day started coughing every 15 minutes to 30 minutes, with resulting hemoptysis on each occasion. The blood was always a dark red.

On January 5, 1967, Mrs. King was again admitted to the hospital with a professional diagnosis: "chest pain, cough with bloody sputum, cause undetermined." On the next day she was seen by Dr. Tom W. Duke, an internist, in consultation. Dr. Duke's report shows:

"It is my impression that this whole process *could* have been repeated small pulmonary emboli with pulmonary infarctions as a result of thrombophlebitis in the lower extremities as well as the pelvic thrombophlebitis." (All emphasis herein are added.)

At this time she was placed on conservative treatment [6] for pulmonary emboli.

On January 30, 1967, Mrs. King was discharged from the hospital. Her same symptoms reoccurred, so she consulted an internist at Arlington, Texas, John J. Walker, M. D. Upon his recommendation and that of Dr. Tom W. Duke and Dr. Patrick Oles, an Amarillo surgeon, the latter performed an inferior Vena Cava [7] plication and a bilateral ovarium vein ligation.

Among the 14 acts and omissions of Dr. Flamm which appellants alleged constituted actionable negligence proximately causing Mrs. King's injuries are the following:

(1) That the defendant failed to use that degree of care and skill that a physician in Amarillo, Texas in the years 1966–67 would be required to exercise;

(2) That the defendant failed to use his best judgment in the treatment of the maladies of the plaintiff, Mary Louise King;

(3) That the defendant failed to use the judgment of the average physician in Amarillo, Texas in the years 1966–67 in the treatment of plaintiff, Mary Louise King;

(4) That the defendant repeatedly failed and refused, after repeated requests of the plaintiffs, to call in a specialist to aid in the diagnosis and treatment of plaintiff, Mary Louise King's, maladies;

(5) That the defendant negligently failed to take notice of dangers known to all physicians, to wit: the development of thrombophlebitis and pulmonary embolism during periods of prolonged confinement and activities of a patient and in particular, during prolonged surgery, and more particularly, after having bone surgery;

(6) That the defendant negligently diagnosed the pulmonary embolism existing in plaintiff, Mary Louise King, as pneumonia.

6. Conservative treatment for pulmonary emboli consists of anticoagulations, whereas radical treatment consists of plications or ligations of the inferior Vena Cava through which the blood circulates from the lower extremities.

7. The inferior Vena Cava is a large vein in the abdomen by which blood is returned to the right atrium from the pelvic area and lower extremities.

Our problem is to determine from the admissible probative evidence if a fact issue was raised to show actionable negligence on any of the grounds alleged, which was a proximate cause of Mrs. King's injuries.

One of the summary judgment components relied on by appellants is a deposition of Dr. Patrick Oles. He was asked if during the primary times Mrs. King was having the physical difficulties (November 6 to January 6) reported to Dr. Flamm, they would constitute reasons for believing that her condition was not pneumonia, or that it should be checked to see if it were pulmonary embolism. His reply, in substance, was that ordinarily the doctor ought to consider some other possibilities. However, the answer was tied to a previous reply to an inquiry as to how long normally in the regular treatment of pneumonia would it take her to recover. Dr. Oles went into great detail in explaining that Staph pneumonia and Klebsiella pneumonia are characterized by resistant factors that may be brought under temporary control by antibiotics and then a week later flare up and the same course of events then reoccur from time to time. He also stated that a combination of chest pain, activity and hemoptysis after ambulation *might* add up to a red flag saying *maybe* it is a pulmonary embolism—should on the other hand be a red flag * * * hemoptysis would certainly *to me* be a red flag as one of the aspects. Dr. Oles also said: "Yes, it could have all been explained from the very first by pulmonary embolism." However, he prefaced such statement by saying he was looking at the patient in retrospect —from X-ray and the course of the patient over past weeks, and that it was easy to diagnose in retrospect.

In the same deposition, in answer to a question by appellee's attorney as to whether the diagnosis made by Dr. Flamm was a proper or acceptable one under the circumstances known to Dr. Flamm, he answered: "I feel strongly it was an accepta-ble diagnosis. There is no question about it."

The affidavit of Dr. Walker of Arlington shows he conducted an extensive examination of Mrs. King on February 3, 1968, with a resulting diagnosis of recurrent pulmonary embolism and pulmonary infarctions. However, the affidavit stated the duration of the illness was unknown but in his opinion the condition had appeared *since* the back surgery. He nowhere explained the word "since", whether the day after discharge or the day before his diagnosis. Also he nowhere stated the diagnosis made by appellee under the circumstances before him failed to show the care and skill of a general practitioner in 1966–67; or that Dr. Flamm had failed to use his best judgment; or that he was negligent in not taking notice of pulmonary embolism following prolonged bone surgery, confinement and inactivity; or that appellee negligently diagnosed pulmonary embolism as pneumonia; or that a diagnosis of pneumonia at the time it was made was improper.

One of the radiologist's readings on December 3, 1966, reports: "These areas of infiltration *could* be secondary to emboli."

All expert testimony on the subject also shows hemoptysis resulting from pulmonary embolism is characterized by a bright red blood. There is not any testimony in the record that the clots expectorated by Mrs. King were bright red. To the contrary all testimony shows it was dark red in color.

Appellants recognize that Dr. Oles in giving his expert opinion, both in his deposition and affidavit, testified Dr. Flamm's diagnosis and treatment were not improper for a general practitioner in Amarillo, Potter County, Texas in 1966–67. But they contend he gave contradictory testimony in his deposition which did show appellee's negligence which was a proximate cause of Mrs. King's injuries.

■ It is the province of the trier of the facts to resolve conflicts and incon-

sistencies in the testimony of a witness or witnesses. Biggers v. Continental Bus System, 157 Tex. 351, 303 S.W.2d 359 (1957); Postal Mutual Indemnity Co. v. Penn, 165 S.W.2d 495 (Tex.Civ.App.— Amarillo, 1942, writ ref'd w. o. m.). In honoring this rule and the rule of inferences in summary judgments, we still are unable to find probative evidence of medical testimony which would show a ground of negligence in diagnosis and treatment which was a proximate cause of Mrs. King's injuries, when applied to the established law of this state. Taking Dr. Oles's statement out of context might show some ground of negligence alleged but we do not believe the rule of inferences goes that far.

■ In our opinion, based on recognized authorities, how Dr. Oles would have diagnosed or treated the patient is not the test. The evidence shows that he had residency training as a surgeon and that he deals with pulmonary embolism constantly. Dr. Flamm could not be considered to have as much knowledge in that field, being only a general practitioner. Both Dr. Oles and Dr. Duke were careful to state in their summary judgment testimony that Dr. Flamm's diagnosis and treatment was reasonable and not improper for a general practitioner in Amarillo, Potter County, Texas. Therefore, Dr. Oles's statement that hemoptysis "would certainly *to me* be a red flag" is not to say that it would be to a general practitioner looking at all other factors of Mrs. King's symptoms at the time of Dr. Flamm's diagnosis and treatment rather than in retrospect; i. e., no pain in the lower extremities, the abating of fever and hemoptysis following the use of antibiotics, etc. Also, Dr. Oles's statement that certain characteristics of Mrs. King's illness *"might* add up to a red flag saying *maybe* there is a pulmonary embolism" must be said to be insufficient to go to a jury for determination as to whether she was suffering from pulmonary embolism at the time of diagnosis and treatment. Our Supreme Court in Bowles v. Bourdon, supra, said: " * * * it is

not enough to show the injury, together with the expert opinion that it *might* have occurred from negligence and many other causes." Likewise, Dr. Duke's statement that " * * * the whole process *could* have been repeated small pulmonary emboli" is not under the authority of Bowles v. Bourdon and Hart v. Van Zandt, supra, a statement that the whole process of Mrs. King's physical signs were repeated small pulmonary emboli. There is just not any expert probative testimony that she had not suffered from some type pneumonia during the subject period. This is particularly true when it is considered that Dr. Duke's affidavit, after reciting Mrs. King's symptoms, stated they were compatible with a diagnosis of pneumonia.

Likewise, there is not any medical testimony to show negligence or proximate cause of injuries for failure to operate instead of using conservative treatment after she was diagnosed as having pulmonary embolism. The medical testimony shows that it cannot be stated with any degree of certainty that the diagnosis of her condition as pulmonary embolism, if such diagnosis had been made on November 6, 1966 or November 20, 1966, and had been a correct one, that conservative treatment would have resulted in her condition having been improved to the extent that some operative procedure upon her major veins would not have ultimately been necessary.

■ Likewise there is not any probative evidence from medical affiants that appellee failed to use his best judgment in the treating of Mrs. King's maladies; or that he failed to use the judgment an average general practitioner in Amarillo in the year 1966–67 would have used; or that he negligently failed to take notice of dangers from pulmonary embolism following bone surgery such as Mrs. King had; or that he negligently diagnosed pulmonary embolism as pneumonia. As heretofore stated, there is not any probative medical testimony that she was not suffering from pneumonia

during the period in which she was treated for it. This being true, there could not be a question to go to the jury of negligence in refusing to call in consultation before he did.

 The question before us is not what we as laymen believe as to the negligence in the treatment and diagnosis but whether there is probative evidence from medical witnesses of any ground of negligence alleged which was a proximate cause of her injuries. Even with the inferences which must be indulged in appeals from summary judgments, we have to say the burden required in malpractice cases was not met.

Accordingly, the judgment of the trial court is affirmed.