Dr. Kenneth FLAMM, Appellant,

v.

Richard Barnett BALL, Appellee.

No. 8228.

Court of Civil Appeals of Texas, Amarillo.

Feb. 7, 1972.

Stone, Stone & Chambers, John C. Chambers, Amarillo, for appellant.

Huff & Bowers, Forrest Bowers, Lubbock, for appellee.

JOY, Justice.

This medical malpractice action was initiated to recover for negligent diagnosis and treatment of a fractured lower right leg resulting in an amputation. Following a jury trial and based on the jury's answers to certain special issues, the trial court entered judgment that plaintiff Richard Barnett Ball recover of and from defendant Dr. Kenneth Flamm the sum of $53,000.00. Dr. Flamm has based this appeal on four assignments of error. We affirm.

The jury found, in response to the special issues, that: (1) Dr. Flamm did not place the cast on Ball's leg tighter than an ordinary prudent doctor would have under the same or similar circumstances; (2) Dr. Flamm delayed splitting the cast beyond such time as an ordinary prudent doctor under the same or similar circumstances would have split such cast; (2A) the delay in splitting the cast was a proximate cause of plaintiff's leg having to be amputated; and (3A) the reasonable present cash value of the loss of earning capacity in the future was $40,000.00; (3B) the physical pain and mental anguish to the date of trial was $10,000.00; and (3C) the future physical pain and mental anguish was $3,000.00.

By his assignments one and two, Dr. Flamm attacks the jury's answers to special issues nos. 2 and 2A as being against the great weight and preponderance of the evidence. These assignments necessitate a review of the evidence. The factual chronology of events is without dispute; the contentions arise by virtue of the interpretation to be given the events.

Ball was a welder. While he was at work on a metal collar weighing approximately 300 pounds, the collar fell some three feet, striking Ball in the right leg, but not causing any laceration. Almost an hour later, at 12:20 a. m., on January 18, 1969, Ball was admitted to the hospital. The admission x-rays revealed a transverse fracture of the right ankle and marked soft tissue swelling was noted. Dr. Flamm, a general medical practitioner, reduced the fracture, beginning at 1:45 a. m. Post-reduction films reflected excellent alignment of the bones. The toes were warm and the color was good. A cast, extending from just below the knee to the toes, was applied. Ball was taken to his room at 3:30 a. m., and Dr. Flamm ordered the right leg elevated on pillows, continuous application of ice packs, the circulation to be checked, and prescribed pain medication and an enzyme to more rapidly decrease the swelling and to digest blood that was within the tissue. At this time Ball's blood circulation was good. At 6:30 a. m., Ball was awake without complaints. At 8:00 a. m., the foot was cool to the touch, a signal that circulation is not good, but the color was good. At 10:15 a. m., the foot was cool to the touch, and the color was mottled, another signal that the circulation was not good. The initial pain medication was given at 11:00 a. m., at which time the foot and toes were still cool to the touch, but at 11:15 a. m., the color was improved although the coolness was still present.

At 1:10 p. m., Dr. Flamm visited the patient. Ball was given pain medication at 6:45 p. m. At 9:00 p. m., the notation "Toes cold and dark, Cast appears tight on foot" was made on the hospital records. A dark color of the toes is associated with impairment of veinous circulation. At

10:00 p. m., Dr. Flamm was notified of the dark appearance of the toes and he arrived at the hospital some thirty minutes later. He tested the blood circulation by pinching the toes, observing the manner in which the toes blanched, and the time in which the color returned. An immediate blanching is suggestive of arterial impairment. Ball was administered a third pain medication at midnight. At 4:45 a. m. on January 19, Ball's toes were more swollen and blue, and he complained of numbness. Dr. Flamm, upon being notified of this condition, ordered the cast split its entire length because it was then too tight. A cast restricts veinous return, and the purpose in splitting the cast is to assist in veinous return to reduce the swelling in the area. At 11:00 a. m., at 3:30 p. m. and at 10:30 p. m., Dr. Flamm saw Ball and on each occasion checked the toes by pressing the nail against the nailbed, and was of the opinion that Ball had some circulation.

Dr. Flamm saw Ball at 8:45 a. m. on January 20, at which time Ball's blood circulation in the leg was not normal—or, esoterically speaking, the circulation was embarrassed—and Dr. Flamm prescribed medication to attempt greater circulation. At 12 midnight, the attending nurse noted in the hospital records: "Patient resting; right foot feels cold. Patient states he has no feeling right foot; can barely move toes. All five toes have bluish appearance." Dr. Flamm apparently was not notified of this condition, but later stated the notation is significant in that it indicates that circulation is definitely worsening.

At about 9:00 a. m. on January 21, Dr. Flamm read the hospital record entries, thought the foot was in a worse condition, and asked for a consultation with Dr. Joe Robberson, an orthopedic surgeon who, due to a shortage of hospital personnel, had assisted Dr. Flamm when the fracture originally was reduced. Thereafter, the cast was spread apart by Dr. Robberson, and later that day a fasciotomy—the cutting of the tissue around the muscle—was

performed on both the front and back of the leg from the knee to the ankle to increase circulation.

On January 27 a femoral arteriogram was performed to determine the condition of the blood vessels in the leg, and on January 28, the leg was amputated about four and one-half inches below the knee. The amputated leg was submitted to Dr. John Denko, a pathologist, for examination. Thereafter, Ball's recovery was uneventful and he spent a total of 31 days in the hospital. It is undisputed that Ball suffered severe pain.

Testimony relative to the medical significance of the events stated above was adduced from Dr. Flamm, Dr. Robberson, Dr. Denko, all of Amarillo, and from Dr. Eugene Brown, an osteopathic physician, of Lubbock. No attack is made upon the qualifications of the medical witnesses; it is their expertise that is challenged.

In addition to providing the medical conditions stated in the preceding narration of events, Dr. Flamm testified that he knew on January 18 that the limb was in difficulty because there was some circulation interference, the degree of which was not known. He knew that the loss of blood circulation in the leg will cause necrosis, which he defined as gangrene, and that the complete loss of circulation will cause the limb to die. He testified that it was not unusual for a foot to become cool following a leg fracture or for it to be mottled in color. A cast which is too tight can cause pressure necrosis. When he saw Ball at 10:30 p. m. on January 19, Dr. Flamm knew that from that time and "maybe from before that," it was just a question of time until the leg would have to be amputated. Based upon his experience, his attendance on Ball, and the pathologist's report, it was his opinion that the injury to the soft tissue at the time of the accident caused the amputation, irrespective of the application of the cast, because the break was incidental to the injury to the soft tissue.

Dr. Robberson's testimony, based on his experience, his observation of Ball on January 21, and the hospital record notations, was that Ball's inadequate circulation was attributable to a combination of veinous and small artery interference not produced by the cast. When Dr. Robberson pulled the cast apart he observed no area of pressure necrosis. The first stages of gangrene, he stated, produce subjective pain, numbness and a coolness to the touch. Dr. Robberson first said that, because he had not seen Ball after the cast was applied and prior to the time he pulled the cast apart, he did not know if the cast should have been pulled apart sooner. Later, he testified, based on the hospital record notations, that the cast was cut at the proper time; and then stated that the cast should have been cut when Dr. Flamm decided it should be cut.

Dr. Denko reported, based on his experience and his examination of the amputated leg, that his examination revealed blood had been released in the tissue which cannot be attributable to pressure of a tight cast which would confine the necrosis to the skin; that the muscle was dead; and that, although it is possible that a cast could impinge upon the right pressure point and cause circulatory embarrassment, he was of the opinion that the gangrenous condition was not brought about by the pressure of the cast.

Dr. Brown's testimony is based upon his experience and interpretation of the hospital records. He stated that a cast applied too tightly interferes with the blood supply, giving rise to severe pain, blue discoloration, swelling and some blanching. It was his opinion that the cast should have been cut no later than 12:30 p. m. on January 18, 1969, and good medical practice would have been to cut it sooner. Had the cast been cut sooner, Dr. Brown opined that the foot would have been maintained, and that the failure to cut the cast resulted in necessitating amputation of the leg.

It was incumbent upon Ball to prove by competent medical evidence that the treatment complained of constituted negligence which was a proximate cause of his injury. Bowles v. Bourdon, 148 Tex. 1, 219 S.W.2d 779 (1949). The testimony presented controverted fact issues to be determined by the jury as to negligence and proximate cause. The jury, by its answers to special issues nos. 2 and 2A, found both negligence and proximate cause. It is especially within the province of the jury to weigh the expert medical opinion evidence, taking into consideration the education and experience of the witnesses, and the degree of attention the defendant doctor gave to the injury. This particularly is true when the judgments and inferences of skilled medical witnesses are contradicted; and the testimony of any one expert witness may be accepted or rejected in whole or in part by the jury. 32 C.J.S. Evidence § 567. The jury had before it Dr. Flamm's admission that a break of the type suffered by Ball could cause some circulatory embarrassment; that he failed to see Ball for some eleven or twelve hours after the cast was placed; that when he then saw Ball he knew that there was difficulty with circulation; and Dr. Brown's testimony that the failure to cut the cast sooner necessitated the amputation. The jury was entitled to believe this evidence as opposed to the other evidence given by Dr. Flamm, Dr. Robberson and Dr. Denko. The record reveals competent medical evidence to meet the test of negligence, Bowles v. Bourdon, supra, and the evidence showed at least a reasonable probability that Ball's complications were caused by Dr. Flamm's negligence. Insurance Co. of North America v. Myers, 411 S.W.2d 710 (Tex.Sup.1966). Considering the evidence as a whole, we cannot say that the jury's findings are so against the great weight and preponderance of the evidence so as to be manifestly wrong and unjust. In re King's Estate, 150 Tex. 662, 244 S.W.2d 660 (1951). Accordingly, Dr. Flamm's first two assignments of error are overruled.

The last two assignments of error are that the jury's finding to special issue no. 3A is not supported by the evidence and that a remittitur should be required in the alternative. Both counsel recognize that in a personal injury action the proof of the measure of a plaintiff's loss of capacity to earn in the future, where there is proof of the extent and amount of damages, is always uncertain, and must be left largely to the sound judgment and discretion of the jury in each case. McIver v. Gloria, 140 Tex. 566, 169 S.W.2d 710 (1943). The parties join issue on the sufficiency of the evidence to show the extent and amount of damages.

Ball was 48 years of age at the time of his injury and he had worked as a welder for four years with his employer. His work required him to climb in and out and around big vessels. He was earning $2.70 an hour at this employment. He had a high school education and always has earned his living by manual labor. He worked on ranches, broke horses and performed in rodeos for profit and pleasure. He lives on a few acres of land and had farmed and grazed cattle on it. After he was able to return to work for the same employer, he was not able to do welding work and was given a job of checking out special tools to the other workmen. The job formerly had been held by a 73 year old man. If the tools are heavy, the workmen come and get them because Ball is not able to lift heavy weights. His pay at the time of trial was $3.04 an hour, which included a recent cost-of-living increase. Since the amputation, he has not been able to ride a horse and use one in his farm operation, as he did before. He is limited in bending over and picking up things and is also limited in the amount of weight he can lift. He has difficulty in walking, particularly on inclines and steps, and he cannot stand for longer than 20 minutes before he has to sit down. If he stands too long his leg becomes sore, and he must take off from work the following day.

Acknowledging these facts, Dr. Flamm argues that the evidence fails to show Ball was not working as many hours now as formerly, how many days he is required to be off work because of his leg, and that he will be unable to earn in the future what he is presently earning, which is an amount greater than before the injury. Thus, it is contended that, in conformity with the rationale in the *McIver* case, supra, where the earning capacity is only impaired, the extent of loss is best shown by comparing the actual earnings before and after the injury, and Ball has shown no facts to indicate his earning capacity has been or will be diminished in the future.

It is true that impairment of earning capacity may be shown by prior earnings, but it may also be shown by a monetary measure of earning capacity prior to injury, Bonney v. San Antonio Transit Co., 160 Tex. 11, 325 S.W.2d 117 (1959), and "(t)he fact that the injured party may continue to work and earn as much as or more than he formally did, especially when in an employment he has been engaged in for years, as in this case, does not bar him from recovering for loss of earning capacity." Mikell v. LaBeth, 344 S.W.2d 702 (Tex.Civ.App.—Houston 1961, writ ref'd n. r. e.). Although Ball introduced no evidence of his prior earnings from his pursuits other than his welding employment, his on-the-job earnings were not a true measure of his earning capacity. It is obvious that Ball relied upon a monetary measure of earning capacity other than his earnings from his employment prior to injury. We believe the evidence adduced in this case met the test prescribed in Dallas Consolidated Electric St. Ry. Co. v. Motwiller, 101 Tex. 515, 109 S.W. 918 (1908), a case wherein plaintiff introduced no evidence of prior earnings, of putting "the jury in possession of facts from which they can determine the extent of impairment of earning power, and (the evidence) is not intended in itself to establish a fixed measure of damages." In

the *Motwiller* case, p. 921, as here, "(w)hen the jury are informed of such a fact as that just stated, they have enough to enable them to allow something upon that score." We hold, therefore, that the evidence in this case is a sufficient monetary measure of Ball's earning capacity prior to the date of his injury and that, under the facts of this case, the verdict is not so excessive as to require a remittitur. The last two assignments of error are overruled.

Affirmed.